ERIK KEMP (State Bar No. 246196)
ek@severson.com
ALISA A. GIVENTAL (State Bar No. 273551)
aag@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Defendant
MERCEDES-BENZ FINANCIAL
SERVICES USA LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALABASAS LUXURY MOTORCARS, INC., | Case No. 2:21-cv-08805 |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STRIKE THE CLASS ALLEGATIONS** |
| vs. | |
| MERCEDES-BENZ USA, LLC; MERCEDES-BENZ FINANCIAL SERVICES USA, LLC; and DOES 1 through 10, | |
| Defendants. | Date:    March 10, 2022<br>Time:    10:00 a.m.<br>Ctrm.:    6D<br>Judge:   Hon. Fernando M. Olguin |

1

# **<u>TABLE OF CONTENTS</u>**

I. INTRODUCTION ........................................................................... 10

II. STATEMENT OF FACTS ............................................................ 12

III. STANDARDS ON THIS MOTION ............................................. 14

IV. THE COURT SHOULD DISMISS THE COMPLAINT ............... 15

   A. Calabasas Alleges No Violation of the Cartwright Act .................... 15

     1. Calabasas Does Not Adequately Allege the Formation and Operation of A

     Conspiracy ..................................................................... 15

     2. Calabasas Does Not Allege Any Wrongful Restraint of Trade ................ 18

   B. Calabasas Alleges No Violation of the UCL .................................. 25

     1. MBFS Did Not Engage in Any Unlawful Conduct ......................... 26

     2. MBFS Did Not Engage in Any Unfair Conduct ........................... 30

V. ALTERNATIVELY, THE COURT SHOULD STRIKE THE CLASS

ALLEGATIONS ............................................................................ 31

   A. The Federal Rules Permit Motions to Strike Class Allegations ............ 31

   B. Calabasas's Class Definition Is an Improper Fail-Safe Class ............... 32

VI. CONCLUSION ......................................................................... 34

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*49er Chevrolet, Inc. v. Gen. Motors Corp.*,
    803 F.2d 1463 (9th Cir. 1986) ........................................................................... 25

*Adashunas v. Negley*,
    626 F.2d 600 (7th Cir. 1980) ............................................................................ 33

*Addison v. Burnett*,
    41 Cal. App. 4th 1288 (1996) .......................................................................... 28

*Alperin v. Vatican Bank*,
    410 F.3d 532 (9th Cir. 2005) ........................................................................... 14

*American Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974) ......................................................................................... 32

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.*,
    204 Cal. App. 4th 1 (2012) ........................................................................ 16, 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................. 14, 15

*In re Auto. Antitrust Cases I & II*,
    1 Cal. App. 5th 127 (2016) .............................................................................. 17

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
    No. 15-CV-01416-BLF, 2016 WL 3880989 (N.D. Cal. July 18,
    2016) ................................................................................................................ 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 554 (2007) .................................................................................. 16, 18

*Bostick v. St. Jude Med., Inc.*,
    No. 03-2636 BV, 2004 WL 3313614 (W.D. Tenn. Aug. 17, 2004) .................. 33

*Branch v. Tunnell*,
    14 F.3d 449 (9th Cir. 1994) ............................................................................. 14

*Brodie v. Workers' Comp. Appeals Bd.*,
    40 Cal. 4th 1313 (2007) .................................................................................. 28

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U. S. 209 (1993) ...................................................................21

*Budget Rent-A-Car of S. Cal. V. Bergman,*
    121 Cal. App. 3d 256 (1981) ......................................................28

*California Assn. of Health Facilities v. Dep't of Health Servs.,*
    16 Cal. 4th 284 (1997) ...............................................................28

*Catholic Mut. Relief Soc. V. Superior Court,*
    42 Cal. 4th 358 (2007) .........................................................28, 29

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) ...............................................................30

*Chaiwong v. Hanlees Fremont, Inc.,*
    No. 16-cv-04074-HSG, 2017 U.S. Dist. LEXIS 142318 (N.D. Cal.
    Sep. 1, 2017) ..............................................................................29

*Chaiwong v. Hanlees Fremont, Inc.,*
    No. 16-CV-04074-HSG, 2018 WL 4677600 (N.D. Cal. Sept. 27,
    2018) ..........................................................................................30

*Chavez v. Whirlpool Corp.,*
    93 Cal. App. 4th 363 (2001) ......................................................15

*Chi. Title Ins. Co. v. Great W. Fin. Corp.,*
    69 Cal. 2d 305 (1968) ..........................................................15, 17

*United States ex rel. Chunie v. Ringrose,*
    788 F.2d 638 (9th Cir. 1986) ......................................................14

*In re Cipro Cases I & II*
    61 Cal. 4th 116 (2015) .....................................................18, 19, 20

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984) ...................................................................16

*Davis v. Ford Motor Credit Co. LLC,*
    179 Cal. App. 4th 581 (2009) ...............................................26, 30

*Davis v. HSBC Bank Nevada, N.A.,*
    691 F.3d 1152 (9th Cir. 2012) ....................................................30

14000.0084/16012269.3

4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

*Dixon v. Monterey Fin. Servs., Inc.*,
    No. 15-CV-03298-MMC, 2016 WL 4426908 (N.D. Cal. Aug. 22,
    2016) ................................................................................................ 33

*Exxon Corp. v. Superior Court*,
    51 Cal. App. 4th 1672 (1997) ................................................... *passim*

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
    55 Cal. App. 5th 381 (2020) ............................................................ 18

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997), *overruled in part on a different
    ground in Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012) ................... 25

*G.H.I.I. v. MTS, Inc.*
    (1983) 147 Cal. App. 3d 256 (1983) ......................................... 15, 16

*Gatley v. Shockley*,
    215 Cal. 604 (1932) ................................................................ 23, 28

*General Tel. Co. v. Falcon*,
    457 U.S. 147 (1982) ........................................................................ 31

*Greene v. Select Funding, LLC*,
    No. 2:20-CV-07333-RGK-KS, 2021 WL 4926495 (C.D. Cal. Feb.
    5, 2021) .................................................................................... 31, 33

*Hagen v. City of Winnemucca*,
    108 F.R.D. 61 (D. Nev. 1985) ........................................................ 33

*Hear-Wear Techs., LLC v. Oticon, Inc.*,
    No. 07-CV-0212-CVE-SAJ, 2007 WL 4379714 (N.D. Okla. Dec.
    12, 2007) (N.D. Okla. Dec. 12, 2007) ........................................... 16

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ........................................................ 21

*Jack Russell Terrier Network v. Am. Kennel Club, Inc.*,
    407 F.3d 1027 (9th Cir. 2005) ........................................................ 17

*John v. Nat'l Sec. Fire & Cas. Co.*,
    501 F.3d 443 (5th Cir. 2007) .......................................................... 31

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

*Kamm v. California City Development Co.*,
   509 F.2d 205 (9th Cir. 1975) ............................................................................. 31

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ............................................................ 16, 17, 18

*Kline v. Sec. Guards, Inc.*,
   196 F.R.D. 261 (E.D. Pa. 2000) ...................................................................... 33

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ......................................................................... 13

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ................................................................................... 26

*Kunert v. Mission Fin. Servs. Corp.*,
   110 Cal. App. 4th 242 (2003) .................................................................... 20, 26

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
   847 F.3d 1221 (10th Cir. 2017) ....................................................................... 16

*Marsh v. Anesthesia Services Medical Group, Inc.*
   200 Cal. App. 4th 480 (2011) .................................................................... 21, 23

*McCaster v. Darden Restaurants, Inc.*,
   845 F.3d 794 (7th Cir. 2017) ........................................................................... 32

*Mercedes-Benz Credit Corp. v. Johnson*,
   110 Cal. App. 4th 53 (2003) ............................................................................ 28

*NCAA v. Alston*,
   141 S.Ct. 2141 (2021) ...................................................................................... 20

*Newcal Indus. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) .................................................................... 21, 23

*O.S.C. Corp. v. Apple Computer, Inc.*,
   792 F.2d 1464 (9th Cir. 1986) ......................................................................... 22

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ................................................................................ 18, 21

*Outdoor Media Group, Inc. v. City of Beaumont*,
   506 F.3d 895 (9th Cir. 2007) ........................................................................... 14

*P & K Prop., LLC v. Hartford Cas. Ins. Co.*,
  No. C 11-06606 SI, 2013 WL 556804 (N.D. Cal. Feb. 12, 2013) ..................... 23

*Palmer v. BRG of Ga., Inc.*,
  498 U.S. 46 (1990) ................................................................................ 20

*Pastoria v. Nationwide Ins.*,
  112 Cal. App. 4th 1490 (2003) ................................................................ 26

*People's Choice Wireless, Inc. v. Verizon Wireless*,
  131 Cal. App. 4th 656 (2005) .................................................................. 30

*Pepka v. Kohl's Dep't Stores, Inc.*,
  No. CV164293MWFFFMX, 2016 WL 8919460 (C.D. Cal. Dec. 21,
  2016) .................................................................................................. 33

*Pilgrim v. Universal Health Card, LLC*,
  660 F.3d 943 (6th Cir. 2011) .................................................................. 31

*Prichard v. Kimball*,
  190 Cal. 757 (1923) ........................................................................ 23, 28

*Queen City Pizza v. Domino's Pizza*,
  124 F.3d 430 (3d Cir. 1997) ................................................................... 25

*Randleman v. Fid. Nat. Title Ins. Co.*,
  646 F.3d 347 (6th Cir. 2011) .................................................................. 32

*Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*,
  290 F.3d 1055 (9th Cir. 2002) ................................................................ 26

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*,
  637 F.2d 1376 (9th Cir. 1981) ................................................................ 25

*Roth v. Rhodes*,
  25 Cal. App. 4th 530 (1994) ................................................................... 21

*Salawy v. Ocean Towers Hous. Corp.*,
  121 Cal. App. 4th 664 (2004) ................................................................. 27

*Sanneman v. Chrysler Corp.*,
  191 F.R.D. 441 (E.D. Pa. 2000) .............................................................. 33

*Sauter v. CVS Pharmacy, Inc.*,
  No. 2:13-CV-846, 2014 WL 1814076 (S.D. Ohio May 7, 2014) ............... 31, 33

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ............................................................... 14

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   782 F. Supp. 2d 1059 (E.D. Cal. 2011) .............................................. 20

*Stubbs v. McDonald's Corp.*,
   224 F.R.D. 668 (D. Kan. 2004) ........................................................... 31

*The Astorian Harbor Supply Co. v. Giaconi*,
   116 Cal. App. 563 (1931) ................................................................... 28

*Tietsworth v. Sears*,
   720 F. Supp. 2d 1123 (N.D. Cal. 2010)............................................. 31

*Ubaldi v. SLM Corp.*,
   No. 11-01320 EDL, 2014 WL 1266783 (N.D. Cal. Mar. 24, 2014) ................ 32

*United States v. Arnold, Schwinn & Co.*,
   388 U.S. 365 (1967), overruled on other grounds by *Cont'l T. V.,
   Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) ................................... 25

*United States v. Topco Assocs.*,
   405 U.S. 596 (1972) ........................................................................... 20

*In re Verifone Secs. Litig.*,
   11 F.3d 865 (9th Cir. 1993) ............................................................... 14

*Williams v. I.B. Fischer Nev.*,
   999 F.2d 445 (9th Cir. 1993) ............................................................. 17

*Yamaha Int'l Corp. v. ABC Int'l Traders, Inc.*,
   No. 86-7892 ....................................................................................... 17

*Zucco Partners v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ............................................................. 14

**Statutes**

1048. The Cartwright Act ...................................................................... 18

Cal. Civ. Code § 2985.7(d) ................................................................... 28

Cal. Civ. Code § 2987(f)........................................................................ 29

Cal. Civ. Proc. Code § 1858 ................................................................... 27

Cal. Com. Code § 10103(a)(10) ............................................................. 28

Calabasas's Cartwright Act ............................................................. 15, 25

California's Cartwright Act, Cal. Bus. & Prof. Code, § 16700, and
    Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200 ........................ 10, 26

Cartwright Act ..................................................................................... *passim*

Cartwright Act. The Cartwright Act ....................................................... 26

Civil Code section 2987 ............................................................. 12, 26, 29

laws. Calabasas's Cartwright Act ........................................................... 24

Sherman Act ..................................................................................... 17, 21

Sherman Act, California's Cartwright Act ............................................... 18

Traditionally, under the Cartwright Act, as under the Sherman Act ...................... 18

Vehicle Code section 11709.4 ............................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 8 and 12(b)(6) ................................................................ 14

Fed. R. Civ. P. 8(a) ................................................................................ 15

Fed. R. Civ. P. 12(f) ............................................................................... 31

Fed. R. Civ. P. 23(c)(1)(A) ..................................................................... 31

Fed. R. Civ. P 23(d)(1)(D) ...................................................................... 31

14000.0084/16012269.3

9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

# I.  INTRODUCTION

Plaintiff Calabasas Luxury Motorscars, Inc. ("Calabasas"), a car dealership, alleges that defendants Mercedes-Benz Financial Services USA LLC ("MBFS") and Mercedes-Benz USA LLC ("MBUSA") improperly conspired to prevent it from exercising its supposed right to purchase leased Mercedes vehicle "trade-ins" from MBFS lessees.  Calabasas's claims fundamentally misconstrue the nature of leases and have no basis under applicable law.   MBFS moves to dismiss for failure to state a claim, and to strike the class allegations as Calabasas has not pled a proper class definition.

MBFS services leases on behalf of its affiliate Daimler Trust, which owns the vehicles.  Each lease provides that the lessee has no ownership interest or equity in the vehicle, unless and until the lessee exercises his purchase option.

Each lease further prohibits any assignment of the lessee's interest in the lease without MBFS's consent. Thus, unless the lessee exercises the purchase option and buys the vehicle from MBFS, there is no right to "trade in" the vehicle—which the lessee does not own.  However, MBFS may, in its discretion, allow a dealer to submit the funds necessary for the customer to exercise the purchase option in connection with the trade in of a leased vehicle.

Recently, MBFS announced that it would no longer provide payoff quotes for lease trade-ins directly to non-franchise dealerships. However, MBFS still provides payoff quotes directly to its lessees, and MBFS still accepts payoff funds from any verified source, including non-franchise dealerships.

Calabasas contends MBFS's practice to not provide payoff quotes directly to non-franchise dealerships is an unlawful restraint of trade.  Though it has no contractual relationship with either MBFS or MBUSA, Calabasas alleges the new policy impedes its ability to exercise a supposed "right" to purchase MBFS-leased vehicles in violation of California's Cartwright Act, Cal. Bus. & Prof. Code, § 16700, and Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200.  As will be

1 shown below, Calabasas's claims are meritless.

2      Calabasas alleges no violation of the Cartwright Act for several reasons.

3      First, the complaint alleges no contract, combination, or conspiracy among

4 economically independent actors.  The Cartwright Act does not prohibit agreements

5 between members of a single, commonly owned family of companies, like MBFS

6 and MBUSA.  The complaint does not allege facts showing that any other entity

7 participated in MBFS's lease trade-in policy.  Nor does the complaint allege any

8 facts, as opposed to conclusions, supporting its assertion that there was any

9 conspiracy.

10      Second, the complaint alleges no per se violation of the Cartwright Act.

11 Though the complaint briefly mentions price-fixing and market allocation, it alleges

12 no facts showing that MBFS's lease trade-in policy involves any horizontal

13 agreement, nor any facts to show that the policy affects prices or allocates markets.

14      Third, the complaint fails to allege an antitrust violation under the rule of

15 reason.  Critical to rule of reason analysis is a definition of the product and

16 geographic market affected by the alleged restraint.  Calabasas' complaint never

17 defines the market affected by MBFS's policy.  The complaint also fails to aver

18 facts showing that MBFS has market power in the relevant market.  Also, MBFS's

19 ability to control the trade-in of leased vehicles, including the purchase price, is

20 granted by the leases to which its customers voluntarily consented.  As those leases

21 are enforceable, they cannot give rise to any improper market for antitrust purposes.

22      Calabasas's claim for violation of the UCL is equally insufficient.  MBFS did

23 not violate the Cartwright Act or any other law by implementing the trade in policy.

24 California does not provide lessees any "right" to trade in leased vehicles or

25 dealerships any "right" to purchase such vehicles.  On the contrary, longstanding

26 California law recognizes that lessees have no ownership interest in leased goods,

27 and no right to transfer any interest in the lessor's goods without its consent.

28      Nothing in the two statutes Calabasas briefly mentions, Vehicle Code section

11709.4 and Civil Code section 2987, states or even suggests the Legislature intended to fundamentally alter longstanding common law by granting lessees title to leased vehicles or the right to transfer or sell those vehicles without their lessors' consent.  As Calabasas's contrary interpretation of Vehicle Code section 11709.4 and Civil Code section 2987 is plainly wrong, it has alleged no violation of the UCL's "unlawful" prong.

Calabasas also alleges no facts suggesting MBFS's conduct was "unfair." MBFS's policy does not violate the letter or spirit of the antitrust law, or any other legislatively declared policy.  Also, it is not unfair for MBFS to enforce the prohibition on assignment in its leases as written.

In addition to dismissing the complaint, the Court should strike the class allegations.  Calabasas's proposed class definition is an impermissible fail-safe class since it is limited to persons to whose supposed rights were "violated" and who suffered damages as a result.  Fail-safe classes impermissibly tie class membership to resolution of the merits in the class's favor, thereby shielding class members from the risk of an adverse judgment and depriving the defendant of the res judicata benefit offered by a judgment against the class.  Fail-safe classes are also improper because they require the court to resolve merits issues simply to determine who is entitled to receive class notice.  Because Calabasas's proposed fail-safe class is patently defective, the Court should strike the class allegations.

For these reasons and others detailed below, the Court should grant the motions and dismiss the complaint and strike the class allegations.

## II.  STATEMENT OF FACTS

Calabasas is a "non-Mercedes franchise" or third-party motor vehicle dealer. Unlike Mercedes-franchised dealerships, Calabasas has no contractual relationship with MBUSA.  FAC, ¶¶ 3, 4, 7.  Calabasas also has no contractual relationship with MBFS.

MBFS services Daimler Trust's vehicle leases.  MBUSA is a distributor of

Mercedes vehicles.  MBUSA and MBFS are both wholly owned indirect subsidiaries of Daimler AG.  (RJN, Ex. 1.)

MBFS's leases expressly state that the lessee has no ownership interest or equity in the vehicle unless the lessee exercises the purchase option, and further prohibit any assignment of the lease without MBFS's consent:

> **Assignment and True Lease.**  You understand that this is a true lease and that you do not have equity or other ownership rights in the vehicle unless you purchase it from us. You may not assign, sell, sublease or arrange an assumption of your interests or rights under this lease or in the vehicle without our written permission.

(Memo, Ex. A ¶ 25.)[1]

MBFS's leases also include a purchase option that may be exercised by the lessee, and explain how the purchase option price will be calculated.  (Memo, Ex. A, ¶ 21; *see also* FAC, ¶¶ 28, 30, 34.  Lessees who exercise the purchase option own the vehicle outright and may transfer the vehicle to another party, including by trading in the vehicle to a dealer of their choice.

The lease's prohibition on assignment bars any assignment of the purchase option without MBFS's consent.  (Memo, Ex. A ¶ 25; *see also* Compl., Dkt. no. 1, ¶ 48.  However, MBFS may, in its discretion, allow a dealer to submit the funds necessary for the customer to exercise the purchase option in connection with the trade in of a leased vehicle. FAC, ¶¶ 32, 34, 45.

Due to the COVID-19 pandemic, there has been "a severe disruption to the global supply chain of motor vehicles."  FAC, ¶ 23.  Limitations on production have created "a drastic shortage on supply" of vehicles.  *Id.*, ¶ 24.

Recently, in response to these pressures, MBFS announced that it would no

---

[1] The lease is properly incorporated by reference and considered on this motion to dismiss since it is referred to in plaintiff's complaint, FAC, ¶¶ 28-30, 43, 45, and its authenticity cannot reasonably be questioned.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

13

1   longer provide payoff quotes directly to non-franchise dealerships.  *Id.*, ¶ 45.

2   However, a "customer may request a purchase option quote at any time, and

3   [MBFS] will accept a payment on a lease purchase from any verified payment

4   source." *Id.*, ¶ 45.  Therefore, a lessee may still trade in a vehicle to a non-franchise

5   dealer by requesting a purchase option quote from MBFS, and then providing the

6   quote to the non-franchise dealer to effectuate the lessee's purchase option..

7        Calabasas nonetheless alleges that the lease trade-in policy "impedes and

8   frustrates the ability of the non-Mercedes franchise dealerships [to] purchas[e]

9   MBFS leased Mercedes vehicles as trade in vehicles …." *Id.*, ¶¶ 43, 44-45, 86, 101.

10   Calabasas further alleges that the practice is an unlawful restraint on trade.  *Id.*, ¶¶

11   69-70.

### III.  STANDARDS ON THIS MOTION

13        On a motion to dismiss, the complaint's properly pleaded facts are presumed

14   true, but conclusions of law are not.  *Alperin v. Vatican Bank*, 410 F.3d 532, 541

15   (9th Cir. 2005); *In re Verifone Secs. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993); *United*

16   *States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  The Court

17   also considers facts which may be judicially noticed[2] or which appear from

18   documents "whose contents are alleged in a complaint and whose authenticity no

19   party questions"—even if the document is not physically attached to the complaint.[3]

20        Under Fed. R. Civ. P. 8 and 12(b)(6), to survive a motion to dismiss, a com-

21   plaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

22   relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

23   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A claim has facial

25   [2] *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009); *Outdoor*

26   *Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007).

27   [3] *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999);

28   *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## IV.  THE COURT SHOULD DISMISS THE COMPLAINT

### A.    Calabasas Alleges No Violation of the Cartwright Act

Calabasas's first count alleges that MBFS and MBUSA violated the Cartwright Act by adopting a policy that MBFS would no longer provide payoffs directly to dealers other than Mercedes-franchised dealers.  FAC, ¶¶ 67-77.

"A cause of action for violation of the Cartwright Act must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts."  *Chavez v. Whirlpool Corp*., 93 Cal. App. 4th 363, 373 (2001) (citation and internal quotations omitted).  California law "demands a 'high degree of particularity in the pleading of Cartwright Act violations.' "  *G.H.I.I. v. MTS, Inc*. (1983) 147 Cal. App. 3d 256, 265 (1983) (quoting *Motors, Inc. v. Times Mirror Co*., 102 Cal. App. 3d 735, 742 (1980)).  Calabasas fails to allege the elements of its Cartwright Act claim under these standards.

#### 1.    Calabasas Does Not Adequately Allege the Formation and Operation of A Conspiracy

Calabasas's Cartwright Act claim first fails as it does not adequately allege the formation and operation of a conspiracy between independent actors.

To plead the conspiracy element of a Cartwright Act claim, "facts must be set forth which indicate the existence of such contracts, combinations or conspiracies" in restraint of trade.  *Chi. Title Ins. Co. v. Great W. Fin. Corp*., 69 Cal. 2d 305, 315-16 (1968).  "[G]eneral allegations of a conspiracy unaccompanied by a statement of facts constituting the conspiracy and explaining its objectives and impact in restraint of trade will not suffice." *G.H.I.I.,* 147 Cal. App. 3d at 265 (citation omitted).

Likewise, under Fed. R. Civ. P. 8(a), "an allegation of parallel conduct and a

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

1   bare assertion of conspiracy will not suffice. Without more, parallel conduct does

2   not suggest conspiracy, and a conclusory allegation of agreement at some

3   unidentified point does not supply facts adequate to show illegality." *Twombly*, 550

4   U.S. at 556-57.  At a minimum, "the complaint must allege facts such as a "specific

5   time, place, or person involved in the alleged conspiracies' to give a defendant

6   seeking to respond to allegations of a conspiracy an idea of where to begin."

7   *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (citing *Twombly*,

8   550 U.S. at 565 n.10).

9        The Cartwright Act prohibits only agreements or conspiracies among

10  economically independent actors, not a single economic entity's unilateral action.

11  *G.H.I.I.*, 147 Cal. App. 3d at 267.  Therefore, "'[a]n indispensable element of any

12  action under the Cartwright Act is proof of a 'combination of resources of two or

13  more independent interests for the purpose of restraining commerce and preventing

14  market competition … .'" *Asahi Kasei Pharma Corp. v. CoTherix, Inc*., 204 Cal.

15  App. 4th 1, 11 (2012) (*citing G.H.I.I.*, 147 Cal. App. 3d at 266).  "[A] complaint for

16  antitrust violations which fails to allege such concerted action by separate entities

17  maintaining separate and independent interests is subject to [dismissal]." *G.H.I.I.*,

18  147 Cal. App. 3d at 266.

19        In *Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752, 768-69

20  (1984), the Supreme Court held that a parent corporation could not conspire with its

21  wholly owned subsidiary for antitrust purposes because they were part of the same

22  economic entity or single enterprise. "[F]ederal courts have consistently applied

23  *Copperweld* to preclude the finding of antitrust conspiracies within a corporate

24  family . . . ." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc*., 847 F.3d 1221,

25  1233 n.4 (10th Cir. 2017) (citation omitted); *see also Hear-Wear Techs., LLC v.*

26  *Oticon, Inc*., No. 07-CV-0212-CVE-SAJ, 2007 WL 4379714, at *4 (N.D. Okla.

27  Dec. 12, 2007) (N.D. Okla. Dec. 12, 2007) (citing cases).

28        California cases follow *Copperweld* and its progeny in holding that the

Cartwright Act does not prohibit agreements or conspiracies among companies under common control. *In re Auto. Antitrust Cases I & II*, 1 Cal. App. 5th 127, 155, (2016); *Asahi Kasei Pharma Corp.*, 204 Cal. App. 4th at 10; *see also Chi. Title Ins. Co. v. Great W. Fin. Corp.*, 69 Cal. 2d 305, 315-16 (1968).

Based on the authorities just cited, Calabasas does not and cannot allege a conspiracy between MBFS and MBUSA in violation of the antitrust laws because the two share a common corporate parent. RJN, Ex. 1. As MBFS and MBUSA are not independent economic actors, their joint action cannot violate the antitrust laws. *Yamaha Int'l Corp. v. ABC Int'l Traders, Inc.*, No. 86-7892 RSWL, 1989 U.S. Dist. LEXIS 16585, at *44 (C.D. Cal. Aug. 11, 1989).

While the complaint also attempts to allege a conspiracy between defendants "and others," defendants and their "co-conspirators," and defendants and their franchise dealerships (FAC, ¶¶ 4, 5, 50-52, 68, 70) those allegations are equally insufficient. Calabasas has alleged no facts suggesting defendants and MBUSA-franchised dealerships had divergent economic interests with respect to the subject matter of the alleged conspiracy. On the contrary, Calabasas alleges that the MBUSA-franchised dealerships share the same economic interest as defendants. FAC, ¶ 8. Defendants thus could not have conspired with their franchise dealerships as a matter of law. *Williams v. I.B. Fischer Nev.*, 999 F.2d 445, 448 (9th Cir. 1993) (affirming grant of summary judgment on antitrust claim against franchisor and franchisee); *Jack Russell Terrier Network v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005) (affirming dismissal of Sherman Act claim where plaintiffs "did not allege in what manner the JRTCA and the  JRTCA regional affiliates named as co-defendants had divergent economic interests, or what goals the affiliates pursued other than those of the JRTCA.").

These allegations are also insufficient because they are conclusory. No specific facts are alleged to show any agreement between the defendants and any other entity regarding MBFS's lease trade-in policy. As in *Kendall*, 518 F.3d at

14000.0084/16012269.3

17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

1048, "the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?"

In short, Calabasas' complaint does not allege "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The complaint alleges the ultimate fact of conspiracy, but it "fail[s] to plead the necessary evidentiary facts to support those conclusions." *Kendall*, 518 F.3d at 1048. The Cartwright Act claim should be dismissed for that reason alone.

## 2. Calabasas Does Not Allege Any Wrongful Restraint of Trade

Like the Sherman Act, California's Cartwright Act prohibits only agreements that *unreasonably* restrain trade. *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc*., 55 Cal. App. 5th 381, 398-99 (2020).

Traditionally, under the Cartwright Act, as under the Sherman Act, a small group of restraints have been condemned as per se antitrust violations "because of their pernicious effect on competition and lack of any redeeming virtue." *Id.*; *Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2283 (2018); *In re Cipro Cases I & II* 61 Cal. 4th 116, 146 (2015) . "Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable per se." *Am. Express*, 138 S.Ct. at 2283-84; (citation omitted).

All other agreements or practices were analyzed under the "rule of reason," which requires the court to "weigh[] the anticompetitive effects of the conduct in the relevant market against its procompetitive effects, and determine[] whether, on balance, the practice harms competition." *Flagship Theatres,* 55 Cal. App. 5th at 400 (citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc*. 551 U.S. 877, 886-887 (2007)).

"More recently, a third category, quick look rule of reason analysis, has emerged. Under the quick look approach, applicable to cases where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and

markets,' a defendant may be asked to come forward with procompetitive justifications for a challenged restraint without the plaintiff having to introduce elaborate market analysis first." *Cipro Cases*, 61 Cal. 4th at 146-47 (citations omitted).

"The emergence of quick look rule of reason analysis did not signal the supplanting of the traditional per se/rule of reason dichotomy with a new trichotomy but rather a shift to something of a sliding scale in antitrust analysis." *Id.*, at 147 (citations and internal quotes omitted).

### (a)   Calabasas Alleges No Per Se Violation of the Cartwright Act

Calabasas alleges no per se violation of the Cartwright Act.

Calabasas's complaint alleges, in conclusory terms, that defendants "and others" have engaged in a price-fixing agreement or a market allocation agreement. (FAC, ¶ 70.)  However, the complaint fails to allege facts sufficient to support those conclusory allegations.

The complaint alleges no horizontal restraint of trade among actual or potential competitors at all.  MBFS and MBUSA are not competitors.  Nor are MBUSA-franchised dealerships competitors with defendants.  Allegations of a vertical restraint are insufficient to state any per se violation of the antitrust laws. *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co*., No. 15-CV-01416-BLF, 2016 WL 3880989, at *12 (N.D. Cal. July 18, 2016).

The complaint also lacks factual allegations showing any agreement or conspiracy "to fix, raise, maintain, and stabilize the prices of ….used Mercedes vehicles"  (FAC, ¶ 70.)  MBFS's lease trade-in policy does not affect (a) the price for which a lessee may purchase the lease car from MBFS,  (b) the price a dealer may offer the customer/lessee for a trade-in of a leased Mercedes car or (c) the price for which the dealer may sell the Mercedes car.  The customer's purchase option is the same price as specified in the lease, regardless of whether the dealer is Mercedes-franchised or not.  MBFS also still accepts payoffs submitted by third-

party dealers, as Calabasas acknowledges.  FAC, ¶ 45.  Calabasas alleges no facts suggesting MBFS has in any way impacted the price dealers can offer for lease trade-ins.  *Kunert v. Mission Fin. Servs. Corp*., 110 Cal. App. 4th 242, 263–64 (2003) (holding plaintiffs could not allege violation of the Cartwright Act where plaintiffs "have not and cannot in good faith assert that Mission Financial set the financing rate dealers must charge their customers, or made any effort whatsoever to restrict the financing rate charged by the dealer").

Calabasas's complaint also fails to allege facts showing any market allocation.  A market allocation agreement divides a market geographically or by product to reduce competition between existing or potential participants at the same level of a market.  *Palmer v. BRG of Ga., Inc*., 498 U.S. 46, 49-50 (1990); *United States v. Topco Assocs*., 405 U.S. 596, 608 (1972).  MBFS's lease trade-in policy is not an agreement to split any market between different Mercedes-franchised dealers or to allow those dealers one part of a market and allow non-franchised dealers some other part of the same market.  Calabasas's conclusory contrary allegations are insufficient to state any per se violation of the Cartwright Act.  *Stanislaus Food Prods. Co. v. USS-POSCO Indus*., 782 F. Supp. 2d 1059, 1075-76 (E.D. Cal. 2011) (dismissing market allocation allegations as conclusory and non-specific, unsupported by facts regarding the alleged agreement).

### (b)  Calabasas Does Not Allege a Rule of Reason Violation

Calabasas also does not allege any rule of reason violation of the Cartwright Act.

"Under the rule of reason, 'the plaintiff has the initial burden to [plead and] prove that the challenged restraint has a substantial anticompetitive effect.' "  *NCAA v. Alston*, 141 S.Ct. 2141, 2160 (2021) (quoting *Am. Express,* 138 S.Ct. at 2284); *see also Cipro Cases,* 61 Cal. 4th at 151-159.[4]  As part of its initial burden, "a plaintiff

---

[4] "[A] long line of California cases has concluded that the Cartwright Act is

14000.0084/16012269.3

20

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008); *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1682 (1997); *Roth v. Rhodes*, 25 Cal. App. 4th 530, 542 (1994); *Am. Express, supra,* 138 S.Ct. at 2285 n. 7.)

"Antitrust law requires allegation of both a product market and a geographic market." *Newcal Indus.*, 513 F.3d at 1045 n.4.  The product market "must encompass the product at issue as well as all economic substitutes for the product"—that is, other products that "have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018); *see also Exxon Corp.*, 51 Cal. App. 4th at 1682 ("the relevant market is composed of products that have reasonable interchangeability for the purpose for which they are produced").  The plaintiff must also allege and prove that the defendant has market power within that market—that is, the defendant has the "ability to raise price profitably *by restricting output*." *Am. Express,* 138 S.Ct. at 2288; *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U. S. 209, 237 (1993).

Also, "an antitrust plaintiff attacking vertical restraints cannot make out a case unless the plaintiff can show some anticompetitive effect in the larger, interbrand market." *Exxon Corp.*, 51 Cal. App. 4th at 1681; *see also Marsh v. Anesthesia Services Medical Group, Inc*. 200 Cal. App. 4th 480, 495 (2011).  "A long line of federal cases stands for the general proposition that vertical restraints

---

patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act." *Roth v. Rhodes*, 25 Cal. App. 4th 530, 542 (1994) (citing *Marin County Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1994)).

14000.0084/16012269.3

21

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

are permissible unless a harmful effect on interbrand competition and an anticompetitive purpose can be shown." *Exxon Corp.*, 51 Cal. App. 4th at 1681 (citing cases); *see also O.S.C. Corp. v. Apple Computer, Inc*., 792 F.2d 1464, 1469 (9th Cir. 1986).

Calabasas's complaint does not satisfy this requirement. The complaint does not allege the existence of a single product market in which MBFS's lease trade-in policy operates to restrain interbrand competition. Instead, the complaint inconsistently refers to:

> 1.   "[T]he market" or "the marketplace" (FAC., ¶¶ 44, 34101).
>
> 2   "[T]he used vehicle market" (*id.*, ¶¶ 4, 58).
>
> 3.   A previous "robust market for third-party lease payoffs and Mercedes trade-in vehicles" (*id*., ¶ 3).
>
> 4.   "[T]he market for vehicles which have been leased" (*id.*, ¶ 54).
>
> 5.   "the market for previously leased MBFS Mercedes vehicles" (*id.*, ¶ 55).
>
> 6.   "[T]he secondary market for the purchase, sale and trade[-]in of used Mercedes vehicles" (*id.*, ¶ 7).

None of these references to a "market" satisfy the requirement of alleging a proper product market in which MBUSA or MBFS exercises market power. The references to a "market" or "marketplace" are plainly insufficient as they do not define the market in terms of any product.

The asserted markets for "used vehicles," "third-party lease pay-offs," and previously leased vehicles do not suffice because Calabasas does not and could not allege that MBUSA or MBFS exercise market power in those broad markets. MBFS does not participate in the market for purchasing MBFS-leased vehicles, except as a recipient of payments. Also, as there are many other car manufacturers and auto finance companies, MBFS's share of the market for used vehicles or pre-viously leased vehicles is plainly too small to allow it to exert market power.

The supposed markets for "previously leased MBFS Mercedes vehicles" and "purchase, sale and trade[-]in of used Mercedes vehicles" and "used Mercedes vehicles sold in California" are equally inadequate. As stated above, the antitrust law prohibit vertical restraints only if they have an "anticompetitive effect in the larger, interbrand market." *Exxon Corp.*, 51 Cal. App. 4th at 1681; *see also Marsh*, 200 Cal. App. 4th at 495. Calabasas alleges no facts suggesting MBFS's trade-in policy impacts the larger market for used vehicles, including brands other than Mercedes vehicles.

Also, even in these artificially narrowed markets, Calabasas has not alleged that MBFS exercises market power. As stated above, MBFS's lease trade-in policy does not affect (a) the price for which a lessee may purchase the leased car from MBFS, (b) the price a dealer may offer the customer/lessee for a trade-in of a leased Mercedes car, or (c) the price for which the dealer may sell the Mercedes car. Calabasas thus not has alleged any adverse impact on competition.

Moreover, Calabasas also cannot define a proper product market because "[t]he law prohibits an antitrust claimant from resting on market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." *Newcal Indus.*, 513 F.3d at 1048 (citing cases).

As Calabasas acknowledges, MBFS's leases provide only the lessee an option to purchase the vehicle. FAC, ¶¶ 28, 32-33. The leases further prohibit lessees from assigning the lease or any interest in it the lease, including the purchase option, without MBFS's consent. (Memo., Ex. A, ¶ 25.) Such restrictions on assignment are common and enforceable under California law. *See, e.g., Gatley v. Shockley*, 215 Cal. 604, 611 (1932) ("provision against assignment applied equally to the lease and to the option."); *Prichard v. Kimball*, 190 Cal. 757, 765 (1923) ("[t]he option must be held to be a part of the lease and governed by the clause that no assignment should be made except with the written consent of the lessors"); *P & K Prop., LLC v. Hartford Cas. Ins. Co.*, No. C 11-06606 SI, 2013 WL 556804, at *7 (N.D. Cal.

14000.0084/16012269.3

23

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

1  Feb. 12, 2013).

2      Calabasas' real complaint is that by not providing payoff quotes directly to

3  third party dealers, MBFS is enforcing the leases as written and not allowing

4  assignment of the purchase options.  Compl., ¶ 40.  Those allegations do not and

5  cannot state any antitrust claim because the supposed "restraint" results from

6  contracts the lessees agreed to voluntarily.

7      *Exxon Corp.,* 51 Cal. App. 4th 1672 is instructive.  There, the plaintiff gas

8  station franchisees sued an oil company, alleging that the parties' franchise

9  agreement improperly required the franchisees to purchase gas from the defendant at

10  excessive prices.  The plaintiffs alleged the franchise agreement's terms imposed an

11  unlawful restraint of trade under the Cartwright Act.  The Court of Appeal roundly

12  rejected this argument, holding the plaintiff could not challenge under the antitrust

13  laws the terms of a contract to which they had voluntarily consented:

14          The franchisees' "lock in" to Exxon results from a business
            relationship of their choosing, the franchise, whose terms
15          were freely entered into by both parties. If the franchise
            agreement is unconscionable or adhesive it may be subject
16          to rescission or reformation. However, these facts do not
            implicate antitrust concerns. Exxon's conduct vis-a-vis the
17          franchisees is part of a negotiated business relationship and
            is not a restraint of trade; it does not directly impact the
18          retail market. And there was no "lock in" until plaintiffs
            voluntarily assumed their roles as franchisees; they had the
19          entire spectrum of gasoline sellers from which to choose in
            deciding how to structure their service station businesses.
20
    *Exxon Corp.,* 51 Cal. App. 4th at 1686.
21

22      Here, as in *Exxon Corp*., the supposed restraint of which Calabasas complains

23  is the result of a freely negotiated contract.  MBFS lessees always have the option to

24  purchase the leased vehicles at any time; however, they cannot assign the purchase

25  option without MBFS's consent.  Memo., Ex. A, ¶ 25.  As the lessees voluntarily

26  entered into those leases and agreed to the prohibition on assignment, Calabasas

27  cannot challenge those contractual terms under the guise of the antitrust laws.

28  Calabasas's Cartwright Act claim should be dismissed for that additional reason.

*Forsyth v. Humana, Inc*., 114 F.3d 1467, 1476 (9th Cir. 1997), *overruled in part on a different ground in Lacey v. Maricopa Cty*., 693 F.3d 896, 928 (9th Cir. 2012) (holding that explicit contractual provisions limiting Humana insureds to certain hospitals could not form the boundaries of an antitrust submarket); *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 443 (3d Cir. 1997) ("Domino's Pizza's control over plaintiffs' 'continued enjoyment of rights and services under their Standard Franchise Agreement' is not a 'market.' Rather, it is a function of Domino's contractual powers under the franchise agreement to terminate the participation of franchisees in the franchise system if they violate the agreement.").

Finally, as explained above, the antitrust laws do "not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business." *49er Chevrolet, Inc. v. Gen. Motors Corp*., 803 F.2d 1463, 1468 (9th Cir. 1986); *see also Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc*., 637 F.2d 1376, 1388 (9th Cir. 1981). In particular, the antitrust laws do not prohibit franchise agreements. *49er Chevrolet, Inc.*, 803 F.2d at 1468; *Exxon Corp.*, 51 Cal. App. 4th at 1686.

Even if MBFS's policy did prevent non-franchise dealerships from purchasing leased MBFS vehicles, it is perfectly lawful to exclude non-franchise dealerships from that slice of the market—just as it is lawful for a manufacturer or distributor to permit only franchised dealerships to sell new vehicles. *See United States v. Arnold, Schwinn & Co*., 388 U.S. 365, 376 (1967), overruled on other grounds by *Cont'l T. V., Inc. v. GTE Sylvania Inc*., 433 U.S. 36 (1977). MBFS is not obligated to do business with every dealer that wishes to purchase its used vehicles. *Ron Tonkin Gran Turismo, Inc*., 637 F.2d at 1388 (holding refusal to appoint new dealership was not a violation of antitrust laws). Calabasas's Cartwright Act claim should be dismissed for that reason as well.

**B.    Calabasas Alleges No Violation of the UCL**

Calabasas's second count attempts to allege a violation of the UCL based on

the same conduct underlying its Cartwright Act claim.  FAC, ¶¶ 78-104.

"The UCL prohibits practices that are either 'unfair' or 'unlawful,' or 'fraudulent.'"  *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496 (2003); Cal. Bus. & Prof. Code § 17200.  Calabasas attempts to allege that MBFS engaged in "unlawful" and "unfair" conduct.  It fails to plead a violation of either prong.

### 1. MBFS Did Not Engage in Any Unlawful Conduct

"Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003).  By the same token, however, a practice that does not violate some other law is not "unlawful" or a violation of that prong of the UCL.  *Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, 290 F.3d 1055, 1057-58 (9th Cir. 2002); *Davis v. Ford Motor Credit Co. LLC*, 179 Cal. App. 4th 581, 592 (2009); *Kunert*, 110 Cal. App. 4th at 262-64.

As already pointed out above, Calabasas has alleged no violation of the Cartwright Act.  The Cartwright Act thus cannot serve as the predicate statute for Calabasas's claim under the "unlawful" prong.  *Kunert*, 110 Cal. App. 4th at 262-64.

Calabasas does not premise its UCL claim on the violation of any other law. Though the complaint mentions two other statutes, Cal. Veh. Code § 11709.4 and Cal. Civ. Code § 2987, *see* FAC, ¶¶ 36-40, it does not expressly allege that MBFS violated either law under its claim that defendants' practice was "unlawful."  *Id.*, ¶¶ 99-104.

Assuming that Calabasas did intend to assert that MBFS violated either law, it has not alleged any violation of either statute.

Vehicle Code section 11709.4 simply addresses the time by which a dealer must submit a payoff request to the prior lienholder "[w]hen a dealer purchases or obtains a vehicle in trade in a retail sale or lease transaction and the vehicle is subject to a prior credit or lease balance  …."  Cal. Veh. Code § 11709.4.  The statute is clearly intended to protect consumers "when" a trade-in is freely

1   negotiated.  Nothing in the statute suggests that the Legislature intended to grant

2   lessees the right to "trade in" vehicles without their lessors' consent or to grant

3   dealerships the right to accept such "trade-ins."

4         In ascertaining legislative intent, "[t]he court's role is to ascertain the

5   meaning of the words used, ' "not to insert what has been omitted" ' or otherwise

6   rewrite the law to conform to an intention that has not been expressed." *Salawy v.*

7   *Ocean Towers Hous. Corp.*, 121 Cal. App. 4th 664, 674 (2004) (quoting *California*

8   *Fed. Sav. & Loan Assn. v. City of Los Angeles*, 11 Cal. 4th 342, 348 (1995)); Cal.

9   Civ. Proc. Code § 1858.  Calabasas's interpretation of section 11709.4 would

10  improperly insert that what has been omitted—an unconditional right to trade in

11  leased vehicles.  It is untenable for that reason.

12        Calabasas, itself, acknowledges that its interpretation of Vehicle Code section

13  11709.4 would read into the statute an unexpressed legislative intent.  Calabasas

14  concedes that section 11709.4 "does not explicitly vest within all licensed dealers

15  the ability to accept leased vehicles as trade in vehicles …."  FAC, ¶ 37.  It

16  nonetheless asserts that such a right must be presumed because "it would be

17  implausible for the Legislature to regulate dealer conduct with respect to accepting

18  leased vehicles as trade in vehicles if dealers did not have the right to accept, and

19  consumers did not have the right to present leased vehicles as trade in vehicles in the

20  first instance." *Id.*

21        Calabasas is wrong.  The Legislature's regulation of dealer conduct when the

22  parties agree to a trade-in of leased vehicle does not necessarily imply an

23  unconditional right to trade in a leased vehicle.  The Legislature plainly can regulate

24  the circumstances under which vehicle trade-ins occur without establishing any right

25  of lessees or third-party dealers to agree to trade-ins absent the vehicle owner's

26  consent.

27        Calabasas's contrary argument must be rejected as it is inconsistent with

28  longstanding common law regarding the nature of leased property.  "As a general

rule, unless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules.  A statute will be construed in light of common law decisions, unless its language clearly and unequivocally discloses an intention to depart from, alter, or abrogate the common-law rule concerning the particular subject matter." *Catholic Mut. Relief Soc. V. Superior Court*, 42 Cal. 4th 358, 372 (2007); *see also Brodie v. Workers' Comp. Appeals Bd.*, 40 Cal. 4th 1313, 1325 (2007); *California Assn. of Health Facilities v. Dep't of Health Servs.*, 16 Cal. 4th 284, 297 (1997) .

Under longstanding California law, a lessee has no ownership interest in leased goods.  A lease is a "transfer of the right to possession and use of goods for a term in return for consideration …"  Cal. Com. Code § 10103(a)(10); *see also* Cal. Civ. Code § 2985.7(d).  The lessee's right to possession and use of goods for a specified term does not grant it title to the goods, which are owned by the lessor. *See Addison v. Burnett*, 41 Cal. App. 4th 1288, 1299 (1996).  Even where, as here, the lease provides the lessee an option to purchase the vehicle, "[a]n option to purchase does not pass title to the optionee …" unless the lessee exercises the option.  *The Astorian Harbor Supply Co. v. Giaconi*, 116 Cal. App. 563, 567 (1931).

In accord with these rules, a lessee has no right to sell or transfer title to a vehicle without the lessor's consent.  *See, e.g., Mercedes-Benz Credit Corp. v. Johnson*, 110 Cal. App. 4th 53, 56-59 (2003) (dealership which leased vehicle from leasing company had no right to sell vehicle to third party buyer); *Budget Rent-A-Car of S. Cal. V. Bergman*, 121 Cal. App. 3d 256, 260-67 (1981) (same).  Also, as explained above, contractual restrictions on the lessee's assignment of any interest in the lease are enforceable.  *See, e.g., Gatley,* 215 Cal. at 61; *Prichard*, 190 Cal. at 765.

The Legislature was aware of these longstanding common law rules governing leases when it enacted Vehicle Code section 11709.4.  If the Legislature intended to fundamentally alter the nature of a lessee's rights in leased goods and

abrogate decades of existing common law, it would have done so expressly. *Catholic Mut. Relief Soc.*, 42 Cal. 4th at 372.  It did not.  Section 11709.4 must therefore be interpreted in light of the longstanding rule that lessees have no ownership interest in leased goods.  There is no right to trade in or sell the lessor's vehicle without its consent.

Calabasas also alleges no violation of Civil Code section 2987, the other statute its complaint briefly mentions.  That section simply provides the lessee may terminate the lease early and provides a sample formula for determining the maximum selling price of the leased vehicle upon early termination  "if, prior to the scheduled expiration date specified in the lease contract, the lessee terminates the lease and purchases the vehicle or trades in the vehicle in connection with the purchase or lease of another vehicle …."  Cal. Civ. Code § 2987(f).

Calabasas does not allege any violation of section 2987.  MBFS did not prevent any customer from terminating his lease early. *See Chaiwong v. Hanlees Fremont, Inc.*, No. 16-cv-04074-HSG, 2017 U.S. Dist. LEXIS 142318, at *9 (N.D. Cal. Sep. 1, 2017) (holding there was no violation of section 2987 where the lease permitted customer to terminate lease early).  MBFS's lease expressly states the customer may terminate the lease early and specifies how early termination charges will be calculated.  Memo., Ex. A, ¶¶ 7, 23.   Nor has Calabasas alleged that MBFS charged any lessee an amount at early termination exceeding that which is permitted by section 2987.

Section 2987 does not grant the lessee the right to sell or trade in the vehicle without the lessor's consent.  The statute provides a sample formula for determining the vehicle's purchase price which may apply "if" there is a trade in of the vehicle, but nowhere states the lessee has the right to trade in the vehicle or in any way suggests the Legislature intended to abrogate the common-law rule that lessees have no right to transfer title to goods owned by the lessor.  And, besides, MBFS still accepts payoff funds submitted by non-franchise dealerships, as Calabasas

29

1   acknowledges.  FAC, ¶ 45.

2       For all of these reasons, Calabasas has alleged no violation of the UCL's

3   "unlawful" prong.

4       **2.     MBFS Did Not Engage in Any Unfair Conduct**

5       Calabasas also fails to allege that MBFS's conduct was unfair.  In the

6   commercial context, the term "unfair" "means conduct that threatens an incipient

7   violation of an antitrust law, or violates the policy or spirit of one of those laws

8   because its effects are comparable to or the same as a violation of the law, or

9   otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc.*

10  *v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 187 (1999).  Any finding of

11  unfairness must "be tethered to some legislatively declared policy or proof of some

12  actual or threatened impact on competition." *Id.* at 186-87; *see also People's*

13  *Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668 (2005).

14      As explained above, Calabasas failed to allege that MBFS violated the

15  antitrust law or any other statute.  There is no legislatively declared policy that

16  lessees have a right to "trade in" property they do not own without the lessor's

17  consent.  Nor has Calasabas alleged any threat to interbrand competition.

18      Also, as MBFS leases expressly state that the lessee has no equity in the

19  vehicle unless the purchase option is exercised, and prohibit any transfer of interest

20  in the lease without MBFS's consent, *see* Memo, Ex. A, ¶ 25, it was not unfair for

21  MBFS to enforce the lease according to its terms.  *See, e.g., Davis v. HSBC Bank*

22  *Nevada, N.A.,* 691 F.3d 1152, 1169-71 (9th Cir. 2012) (annual fee disclosed in terms

23  and conditions of online credit card application was not unfair); *Davis*, 179 Cal.

24  App. 4th at 593-98 (auto finance company's assessment of late fees pursuant to

25  contract and statute not unfair); *Chaiwong v. Hanlees Fremont, Inc*., No. 16-CV-

26  04074-HSG, 2018 WL 4677600, at *4 (N.D. Cal. Sept. 27, 2018) (finance

27  company's attempt to collect fees owed to it at lease end was not unfair).

28

14000.0084/16012269.3

30

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

## V.  ALTERNATIVELY, THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS

**A.      The Federal Rules Permit Motions to Strike Class Allegations**

The Federal Rules provide a mechanism for excising defective class allegations.

The Federal Rules require that class certification be decided at "an early practicable time."  Fed. R. Civ. P. 23(c)(1)(A).  Under Fed. R. Civ. P. 12(f), the Court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter."  Under Fed. R. Civ. P 23(d)(1)(D), the Court may issue an order "requiring that the pleadings be amended to eliminate allegations about representation of absent persons."  Joined together, these rules authorize the Court "to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained."  *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1146 (N.D. Cal. 2010).

"Sometimes the issues are plain enough from the pleadings to determine whether …" the action is appropriate for class certification.  *General Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982); *see also Kamm v. California City Development Co.*, 509 F.2d 205, 207-212 (9th Cir. 1975).  In those instances, "[t]he court need not wait for a motion for class certification …."  *Stubbs v. McDonald's Corp.*, 224 F.R.D. 668, 674 (D. Kan. 2004).

The Court may strike the class allegations when the pleadings show the plaintiff cannot meet any required element of certification.  *See, e.g., Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011).  Most pertinent here, the court may strike class allegations "[w]here it is facially apparent from the pleadings that there is no ascertainable class ….."  *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007); *Greene v. Select Funding, LLC*, No. 2:20-CV-07333-RGK-KS, 2021 WL 4926495, at *5 (C.D. Cal. Feb. 5, 2021); *Sauter v. CVS Pharmacy, Inc.*, No. 2:13-CV-846, 2014 WL 1814076, at *2 (S.D. Ohio May 7,

14000.0084/16012269.3

31

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

1  2014).

2  **B.    Calabasas's Class Definition Is an Improper Fail-Safe Class**

3          Calabasas's class definition should be stricken because it is an impermissible

4  fail-safe class.  The class is comprised "of all non-Mercedes franchise vehicle

5  dealerships in California whose right to accept MBFS leased Mercedes vehicles as

6  trade in vehicles and whose right to purchase MBFS leased Mercedes vehicles has

7  in the past been or will in the future will be infringed upon and violated, and who

8  have or will suffer damage, as a result of Defendants' unfair, unlawful, and

9  anticompetitive conduct as stated herein."  FAC, ¶ 63.  As the class is limited to

10  dealerships whose "rights" have been or will be "infringed upon and violated" and

11  who have suffered or will suffer damages "as a result of Defendants' unfair,

12  unlawful, and anticompetitive conduct …," class membership is dependent on

13  adjudication of a merits issue in the class members' favor.

14          "This is an improper fail-safe class that shields the putative class members

15  from receiving an adverse judgment.  Either the class members win or, by virtue of

16  losing, they are not in the class and, therefore, not bound by the judgment."

17  *Randleman v. Fid. Nat. Title Ins. Co*., 646 F.3d 347, 352 (6th Cir. 2011); *see also*

18  *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 799 (7th Cir. 2017).  "That is

19  not only 'palpably unfair to the defendant,' but it is also unmanageable because it is

20  unclear in such cases to whom class notice should be sent."  *Ubaldi v. SLM Corp*.,

21  No. 11-01320 EDL, 2014 WL 1266783, at *6 (N.D. Cal. Mar. 24, 2014) (*citing*

22  *Kamar v. RadioShack Corp*., 375 F. App'x 734, 736 (9th Cir. 2010)).

23          Fail-safe classes are fundamentally unfair and revive in another form

24  impermissible one-way intervention.  *See American Pipe & Constr. Co. v. Utah,* 414

25  U.S. 538, 546-50 (1974).  If the defendant prevails, there are no members of a class

26  that is defined by a putative class member's success on the merits.  So no one is

27  bound by a defense judgment.  But, if plaintiffs win, there may be many members of

28  a class so defined.  "Such a class is prohibited because it would allow putative class

members to seek a remedy but not be bound by an adverse judgment …." *Sauter*, 2014 WL 1814076, at *4 (citations omitted); *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980).

Merits-based class definitions are also improper because they require the Court to adjudicate the merits at the outset to decide who is entitled to notice, thereby defeating the type of efficiency class actions are designed to achieve.[5] "The multitude of individual inquiries simply to determine class membership is inapposite to the expected efficiencies of a class action." *Kline v. Sec. Guards, Inc.*, 196 F.R.D. 261, 268 (E.D. Pa. 2000).

Calabasas's proposed class definition is an improper fail-safe class. Membership is dependent on adjudication of a merits issue—deprivation of the supposed "right" to accept a leased vehicle as a trade-in—in the class members' favor. Potential class members either win and are in the class or lose and are not bound in any way.

Also, class membership cannot be determined without an individualized mini-trial of the circumstances under which the dealer's rights were allegedly violated or caused any damage. Since it is neither practical nor permissible to determine class membership based on whether the a right was violated or damage has been suffered, the class definition is unascertainable for that additional reason. *See, e.g., Greene*, 2021 WL 4926495, at *5 (granting motion to strike fail-safe class); *Pepka v. Kohl's Dep't Stores, Inc.*, No. CV164293MWFFFMX, 2016 WL 8919460, at *4 (C.D. Cal. Dec. 21, 2016) (same); *Dixon v. Monterey Fin. Servs., Inc.*, No. 15-CV-03298-MMC, 2016 WL 4426908, at *2 (N.D. Cal. Aug. 22, 2016) (same).

---

[5] *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 63-64 (D. Nev. 1985); *see also Bostick v. St. Jude Med., Inc.*, No. 03-2636 BV, 2004 WL 3313614, at *16 (W.D. Tenn. Aug. 17, 2004); *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 445 (E.D. Pa. 2000).

# VI.  CONCLUSION

For the reasons stated above, the Court should grant the motion and dismiss the complaint with prejudice.  If the Court does not dismiss the case in its entirety, the Court should strike the class allegations.

DATED:  January 28, 2022

SEVERSON & WERSON
A Professional Corporation

By:  _____
*/s/ Erik Kemp*
Erik Kemp

Attorneys for Defendant
MERCEDES-BENZ FINANCIAL
SERVICES USA LLC

14000.0084/16012269.3

34

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
MERCEDES-BENZ FINANCIAL SERVICES USA LLC'S MOTION TO DISMISS

# EXHIBIT A

# CALIFORNIA
## MOTOR VEHICLE LEASE AGREEMENT

The First Class Lease®

### Dates

The date of this lease is _____

The scheduled term of this lease is _____ months ("Lease Term").

The scheduled date this lease ends is _____ ("Lease End").

### Type of Lease

☐ Standard Lease   ☐ Single Payment Lease

If the Single Payment Lease box is checked above, "Monthly Payment", "Monthly Payments" or "First Monthly Payment" are replaced with the words "Single Lease Payment" throughout this lease and the word "Monthly" in section 4.j. below is deleted.

### Parties

Lessor (Dealer): _____

Address: _____

Lessee: _____
Address: _____

Lessee's
Billing
Address: _____
(Include Zip code)

Address of principal garage location, if different from Lessee's Billing Address (no P.O. Box): _____

### Vehicle Information

☐ New   ☐ Pre-owned   ☐ _____

Year ___ Make ___ Model ___ Body Style ___ Odometer Reading ___

#### Primary Intended Use

☐ Personal   ☐ Business, Commercial, or Agricultural Purposes

If no box is checked, or if the Personal box is checked, you agree to use the vehicle for personal, family or household purposes.

Unless otherwise specified, "lease" refers to this Motor Vehicle Lease Agreement, "vehicle" refers to the vehicle described above; "you", "your", and "yours" refer to the Lessee and any Co-Lessee; "we", "us", and "our" refer to the Lessor named above, and its successor. In assignee, is assigned, "Assignee" refers to DAIMLER TRUST or its successors and assigns. The "Vehicle Turn-In Fee" is the fee shown in section 4 that is due at the scheduled end of the lease. The terms and conditions contained in this lease are made on behalf of Lessor and Assignee.

## Consumer Leasing Act Disclosures

| 1. Amount Due at Lease Signing or Delivery | 2. Monthly Payments | 3. Other Charges (not part of your Monthly Payment) | 4. Total of Payments |
|---|---|---|---|
| (Itemized below) * $ _____ | Your first Monthly Payment of $ _____ followed by _____ payments of $ _____ due on the _____ of each month. The total of your Monthly Payments is $ _____ | a. Vehicle Turn-In Fee (if you do not purchase the vehicle at Lease End) $ _____  b. Total $ _____ | (The amount you will have paid by the end of the lease.) $ _____ |

### 5. Itemization of Amount Due at Lease Signing or Delivery

**a. Amount Due at Lease Signing or Delivery:**

| | |
|---|---|
| First Total Monthly Payment (Includes sales/use taxes) | $ _____ |
| Capitalized Cost Reduction | $ _____ |
| Acquisition Fee (if not capitalized) | $ _____ |
| Sales/Use Taxes | $ _____ |
| Refundable Security Deposit | $ _____ |
| Registration/Titling Fees | $ _____ |
| License Fees | $ _____ |
| Document Processing Fee (not a government fee) | $ _____ |
| Electronic Filing Fee (not a government fee) | $ _____ |
| California Tire Fees | $ _____ |
| | $ _____ |
| | $ _____ |
| Total | $ _____ |

**b. How the Amount Due at Lease Signing or Delivery will be paid:**

| | |
|---|---|
| Net Trade-in Allowance | $ _____ |
| Rebates and Noncash Credits | $ _____ |
| Amount to be Paid in Cash | $ _____ |
| | $ _____ |
| Total | $ _____ |

### 6. Your monthly payment is determined as shown below:

a. **Gross Capitalized Cost.** The agreed upon value of the vehicle ($ _____) and any items you pay over the lease term (such as service contracts, insurance, and any outstanding prior credit or lease balance). $ _____

b. **Capitalized Cost Reduction.** The amount of any net trade-in allowance, rebate, noncash credit, or cash you pay that reduces the Gross Capitalized Cost. $ _____

c. **Adjusted Capitalized Cost.** The amount used in calculating your Base Monthly Payment. $ _____

d. **Residual Value.** The value of the vehicle at the end of the lease used in calculating your Base Monthly Payment. $ _____

e. **Depreciation and any amortized amounts.** The amount charged for the vehicle's decline in value through normal use and for other items paid over the lease term $ _____

f. **Rent Charge.** The amount charged in addition to the Depreciation and any amortized amounts. + $ _____

g. **Total of Base Monthly Payments.** The Depreciation and any amortized amounts plus the Rent Charge. $ _____

h. **Lease Payments.** The number of payments in your lease ÷ _____

i. **Base Monthly Payment.** $ _____

j. **Monthly Sales/Use Taxes.** + $ _____

k. **Total Monthly Payment.** = $ _____

### 7. Early Termination.
You may have to pay a substantial charge if you end this lease early. The charge may be up to several thousand dollars. The actual charge will depend on when the lease is terminated. The earlier you end the lease, the greater this charge is likely to be.

### 8. Excessive Wear and Use.
You may be charged for excessive wear based on our standards for normal use and for mileage in excess of _____ miles (Mileage Allowance) for the term of this lease, at the rate of _____ per mile.

### 9. Purchase Option at End of Lease Term.
You have an option to purchase the vehicle ("as is") at the end of the lease term for $ _____ plus a Purchase Option Fee of $ _____, plus all official fees and taxes. See the Purchase Option section on the back of this lease for more information.

### 10. Other Important Terms.
See your lease documents for additional information on early termination, purchase options, maintenance responsibilities, warranties, late and default charges, insurance, and any security interest, if applicable.

### 11. Itemization of Gross Capitalized Cost

Agreed upon value of vehicle as equipped at time of Lease signing ... $ _____
Accessories and optional equipment Lessor agrees to add to the vehicle after lease signing:

| (Describe) | $ _____ |
|---|---|
| (Describe) | $ _____ |
| (Describe) | $ _____ |
| (Describe) | $ _____ |
| (Describe) | $ _____ |

Total agreed upon value of vehicle ... $ _____
Other amounts included in the Gross Capitalized Cost:
| Acquisition Fee (if capitalized) | $ _____ |
| Sales/Use Tax | $ _____ |
| License Fees | $ _____ |
| Registration/Titling Fees | $ _____ |
| California Tire Fees | $ _____ |
| Document Processing Fee (not a government fee) | $ _____ |
| Outstanding Prior Credit or Lease Balance on Trade-in Vehicle Included in Gross Capitalized Cost | $ _____ |
| Electronic Filing Fee (not a government fee) | $ _____ |

Optional Products and Services:
| Credit Life Insurance Premium | $ _____ |
| Credit Disability Insurance Premium | $ _____ |
| Charge for Service Contract | $ _____ |
| Charge for Maintenance Agreement | $ _____ |
| (Describe) | $ _____ |
| (Describe) | $ _____ |
| (Describe) | $ _____ |
| (Describe) | $ _____ |
| Other: | |
| (Describe) | $ _____ |
| (Describe) | $ _____ |
| Total Gross Capitalized Cost | $ _____ |

### 12. Estimated Official Fees and Taxes

The total estimated amount you will pay for official fees, license, title and registration fees, and taxes over the term of your lease, whether included with your Monthly Payment or assessed otherwise is $ _____. This is an estimate and the actual total of Official Fees and Taxes may be higher or lower than this estimate. The actual total of Official Fees and Taxes depends on the rates in effect, the value of the vehicle and the garage location of the vehicle at the time the fees and taxes are assessed.

### 13. Military Allotment
The odometer reading in the Vehicle Information section of this lease provides the number of miles existing on the vehicle when you entered this lease ("Existing Miles"). Your Mileage Allowance provided in section 8 refers to miles driven during the Lease Term and does not include the Existing Miles.

If your Mileage Allowance in section 8 above is greater than "Base Mileage Amount", you have chosen to purchase additional miles for your lease. If you entered into this lease with a high mileage vehicle, at Lease End, except as provided below, you will be eligible for a credit or refund of _____ per mile for any unused additional miles between the Base Mileage Amount and your Mileage Allowance over the term of the lease. You will not receive a refund if the vehicle is destroyed or stolen, you are in default, you purchase the vehicle, or the refund is less than $1.

### Important Arbitration Disclosures

The following arbitration provisions significantly affect your rights in any dispute with us. Please read the following disclosures and the arbitration provision that follows carefully before you sign the contract.

1. If either you or we choose, any dispute between you and us will be decided by arbitration and not in court.

2. If such dispute is arbitrated, you and we will give up the right to a trial by a court or a jury trial.

3. You agree to give up any right you may have to bring a class action lawsuit or class arbitration, or to participate in either as a claimant, and you agree to give up any right you may have to consolidate your arbitration with the arbitration of others.

4. The information that can be obtained in discovery from each other or from third persons in arbitration is generally more limited than in a lawsuit.

5. Other rights that you and/or we would have in court may not be available in arbitration.

Any claim or dispute, whether in contract, tort or otherwise (including the dispute over the interpretation, scope, or validity of this lease, arbitration section or the arbitrability of any issue), between you and us or any of our employees, agents, successors or assigns, which arises out of or relates to a credit application, this lease, or any resulting transaction or relationship (including any such relationship with third parties who do not sign this lease) shall, at the election of either you or us, or our successors or assigns, be resolved by a neutral, binding arbitration and not by a court action. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis. Whoever first files for arbitration may choose to proceed under the applicable rules of the National Center for Dispute Settlement (www.ncdsusa.org) or any other organization that you may choose subject to our approval. ...

### 14. Maintenance
If you do not return the vehicle's maintenance booklets as provided in the Maintenance section of this lease, you will owe a missing records fee in the amount of $ _____

### 15. New and Pre-owned Vehicle Warranty
If the vehicle is new, it is covered by a warranty whole vehicle warranty from the manufacturer.

If the vehicle is pre-owned, it is not covered by a warranty unless indicated by a check in the corresponding box below.
☐ Remainder of standard new vehicle warranty from manufacturer
☐ Pre-owned vehicle warranty from manufacturer
☐ Pre-owned warranty from other third-party provider

We assign to you all rights we have under any of these warranties. You acknowledge that you have received a copy of the indicated warranties.

**We lease the vehicle to you "AS IS", EXCEPT AS EXPRESSLY PROVIDED UNDER THIS LEASE, AND UNLESS PROHIBITED BY LAW, WE MAKE NO WARRANTIES OR REPRESENTATIONS, EITHER EXPRESS OR IMPLIED, AS TO THE VEHICLE'S CONDITION, VALUE, DESIGN, OPERATION, CONDITION, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE AND WE MAKE NO OTHER REPRESENTATION OR WARRANTY WHATSOEVER.**

### 16. Optional Insurance and Other Products
You are not required to buy any of the optional insurance or other products listed below to enter into this lease, and they are not a factor in our credit decision. These insurance and other products will not be provided unless you so agree and you agree to pay the additional cost shown. By signing below, you agree that you have received a notice of the insurance or product, or you have requested the insurance or product for the premium or charge shown. A portion of the premium or charge shown may be retained by the Lessor (Dealer). These coverages are not provided by the Lessor. You may cancel all matters stated to these coverages, including cancellation terms and conditions, are provided in a separate contract, which you acknowledge that you have received and read.

If the price of these coverages is also included in the Itemization of Gross Capitalized Cost, it will be included in the Base Monthly Payments. If not, you have to pay the additional amount as part of the insurance or product is provided in a separate contract, which you acknowledge that you have received and read.

If the price of these coverages is also included in the Itemization of Gross Capitalized Cost, it will be included in the Base Monthly Payments. If not, you have paid for the coverages in full upon signing this lease.

Unless you receive written notification otherwise, credit life and credit disability insurance and on the original due date of the last payment due under the lease.

☐ Credit Life Program
Initial Coverage $ _____ Prem. $ _____
Lessee/Co-Lessee Initials ___
☐ Credit Disability Provider
Maximum Mo. Benefit $ _____ Prem. $ _____
Lessee/Co-Lessee Initials ___
☐ Service Agreement Provider
Coverage is for _____ months or _____ miles, whichever happens first.
Premium or charge $ _____ Lessee/Co-Lessee Initials ___
☐ Extended Warranty Provider
Coverage is for _____ months or _____ miles, whichever happens first.
Premium or charge $ _____ Lessee/Co-Lessee Initials ___

### Additional Disclosures

| DESCRIPTION OF TRADE-IN | YEAR | MAKE | | Gross agreed upon value of trade-in vehicle $ _____ |
|---|---|---|---|---|
| Lessee | Co-Lessee | | | Outstanding prior credit or lease balance on trade-in $ _____ |
| | | | | Net trade-in allowance (if less than -0-, enter -0-) $ _____ |

Initial if applicable

Lessee ___ Co-Lessee ___ **10-Day Right to Cancel.** We intend to assign this lease to Daimler Trust. You understand that if you have a few days to verify your credit and assign the lease. You agree that if the lease is not accepted for assignment under terms acceptable to us, we have the right to cancel this agreement. Should we elect to cancel, we will give you notice within 10 days of the date this lease is signed. Upon receipt of such notice, you must immediately return the vehicle to us in the same condition as when delivered, normal wear and tear excluded. If vehicle is returned in a condition that is acceptable to us, we will refund all consideration given.

Lessee ___ Co-Lessee ___ **Payoff of Trade-in.** We relied on information from you and/or the lienholder or lessor of your trade-in vehicle as to the amount of the payoff amount of $ _____. You understand that the amount quoted is an estimate. We agree to remit this amount to the lienholder or lessor of the trade-in vehicle, or its designee. If the actual payoff amount is more than the amount above, you agree to pay us the excess on demand. If the actual payoff amount is less than the amount shown above, we will refund to you any overage we receive from the prior lienholder or lessor.

Lessee ___ Co-Lessee ___ **Lease Return Obligations.** We agree to deliver your trade-in lease vehicle described as (Year) _____ (Make) _____ (Model) _____ (VIN) _____, to _____ ("Prior Lessor") on your behalf. You understand this vehicle is not being sold to, or traded in to us. We have agreed to remit to the vehicle's lessor the sum of $ _____. Any amount of such remittance that has been paid for by you will appear in the Itemization of Gross Capitalized Cost. You agree to pay any amounts related to mileage, wear and tear, termination, or other obligations owed to the prior lessor in excess of the stated amount on your existing lease.

THIS BOX IS FOR USE BY LESSOR (DEALER) AND YOU TO MEMORIALIZE TRADE-IN, TURN-IN OR OTHER RELATED OBLIGATIONS. THIS IS NOT PART OF THE LEASE. IF NO TRADE-IN, TURN-IN OR OTHER RELATED OBLIGATION, "NONE" OR "N/A". ANSWER MUST BE OBTAINED FROM AGREEMENT AS DISCLOSED HERE.

You have a right to return the vehicle and receive a refund of any payments made if the credit application is not approved, unless nonapproval results from an incomplete application or from incorrect information provided by you.

**THERE IS NO COOLING-OFF PERIOD**
California law does not provide for a "cooling off" or other cancellation period for vehicle leases. Therefore, you cannot later cancel this lease simply because you change your mind, decided the vehicle costs too much, or wish you had acquired a different vehicle. You may cancel this lease only with the agreement of the Lessor or for legal cause, such as fraud.

### Notices/Signatures

**NOTICE TO LESSEE: (1) DO NOT SIGN THIS LEASE BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES TO BE FILLED IN. (2) YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS LEASE; (3) WARNING - UNLESS A CHARGE IS INCLUDED IN THIS LEASE FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR THAT COVERAGE IS NOT PROVIDED BY THIS LEASE.**

**LESSEE**
By signing below, you acknowledge that:
• This lease is completely filled out;
• You have read the entire lease carefully and agree to all of its terms, INCLUDING THE IMPORTANT ARBITRATION DISCLOSURES ABOVE;
• You have received a completed copy of this lease; and the Lessor may assign all right, title, and interest in this lease, vehicle and Guaranty to Assignee.

**GUARANTY**
The Guarantor(s) named below absolutely and unconditionally guarantee(s) payment of all amounts owed under this lease. This means if the lessee(s) fail(s) to pay any money owed, guarantor(s) will pay it. ...

Guarantor(s) also agree to be bound with and upon the terms of this lease. Guarantor(s) also agree to be liable for all fees and costs, including attorneys' fees, that the Lessor incurs in enforcing this lease or guaranty.

Guarantor(s) has/have received a completed copy of this lease and guaranty at the time of signing.

**LESSOR SIGNATURE AND ASSIGNMENT**
By signing below, the Lessor accepts the terms and conditions of this lease. Lessor assigns all right, title and interest to this lease, vehicle and Guaranty to Daimler Trust, subject to the terms and conditions of Lessor's agreement(s) with Mercedes-Benz Financial Services USA LLC.

NOTICE: SEE REVERSE SIDE FOR ADDITIONAL TERMS AND CONDITIONS OF THIS LEASE.
ALL TERMS AND CONDITIONS ON THE FRONT AND BACK OF THIS LEASE, INCLUDING THE ARBITRATION DISCLOSURES ABOVE, ARE A PART OF THIS LEASE.

## 17. Maintenance

You agree to maintain, service and repair the vehicle with genuine Mercedes-Benz replacement parts according to the manufacturer's recommendations and any applicable warranty requirements. You agree to have all maintenance and repairs performed by authorized Mercedes-Benz collision facilities. You will keep the vehicle in good operating condition and return the maintenance booklets with the vehicle. You agree to comply with all vehicle recall notices. You agree to pay for all operating costs including, but not limited to gas, oil, inspection and certification fees, fines, towing, and repair/replacement costs. You will not make any alterations to the vehicle unless you agree at your option to buy a separate maintenance agreement.

## 18. Prohibited Uses of Vehicle

You agree not to use or allow anyone else to use the vehicle: (a) in a way that violates the law or the terms of your insurance policy or that causes cancellation or suspension of any applicable warranty; and (b) to transport goods or people for pay. Your data agree not to take the vehicle outside the United States; however, you may take the vehicle to Canada or Mexico for 30 days or less.

Unless the Primary Intended Use is marked as "Business, Commercial, or Agricultural Purposes", you agree that the vehicle will be used primarily for your own personal, family or household use.

You will not change or modify the vehicle's body or interior in any way unless you first get our written consent. If you add parts to the vehicle that cannot be removed without harming the vehicle's usefulness or value, you understand that those parts become our property. We may inspect the vehicle at any reasonable time.

You will not assign or sublease any interest in the vehicle or this lease. You will keep the vehicle and lease free from all liens.

You agree that you and anyone else that uses the vehicle are liable for any injury, death, or damage arising out of the use of the motor vehicle, and that we are not liable for any such injury, death or damage.

## 19. Vehicle Insurance

You agree to provide primary insurance coverage as indicated below during the lease and until the vehicle is returned: (a) liability insurance with limits of not less than $100,000 per person for bodily injury, $300,000 per accident for bodily injury and $50,000 per accident for property damage; (b) collision insurance for the actual value of vehicle and with a deductible no higher than $2,500; (c) comprehensive fire and theft insurance for the actual value of vehicle and with a deductible no higher than $2,500; and (d) uninsured motorist coverage as required by law in the state where the vehicle is registered. You may obtain other insurance coverage if you choose which is reasonably acceptable to us. The insurance policy must name Assignee as additional insured and loss payee and you must provide us with a copy of your policy. If you carry any insurance that reduces our coverage, it shall apply on a primary, direct basis to the extent permitted by law. The policy must require the insurance company to notify us at least 30 days in advance of any change in coverage or cancellation. You will notify us and your insurance company in the event the vehicle is lost, stolen or damaged, and you agree to cooperate in the prosecution of claims. In the event the vehicle is damaged or destroyed, or if any payments from the insurance company are insufficient to cover the costs of repair, you shall remain liable to us for any deficiency. You agree to reimburse us for any insurance premiums paid by us if your claim, you will be in default and will pay us the full amount of the unpaid balance.

## No physical damage or liability insurance coverage for bodily injury or property damage caused to others is included in this lease.

## 20. Total Vehicle Loss/Gap Waiver

If the vehicle is subject to a total loss due to collision, destruction or theft, you will pay us the Gap Amount which is the difference between the Early Termination Liability and the insurance proceeds we receive based on the total loss. We agree to waive the Gap Amount if you had the vehicle insurance required by this lease at the time of total loss. If your insurance carrier pays us more than the Gap Amount, we will pay the excess to you. You will not be required to pay the Gap Amount if: (1) you were not in default under this lease; (2) your insurance carrier pays us the full amount of your insurance deductible; (3) a) any other required amounts you owe under the lease at the time of the total loss, including any amount past due (less any unearned rent charges and unpaid fees); and (4) you cooperate with us in the collection of insurance proceeds. We will reduce the amount of our obligation under this section by the amount of any insurance deductible. If you choose not to carry the insurance required by this lease, or if your coverage lapses at the time of the loss, you will be responsible for the entire amount owed.

This subsection will not apply and you will be in default if you cancel or cause settlement from your insurance company without first receiving our consent and forwarding any such settlement to us.

## 21. Purchase Option

If you purchase the vehicle at any time, you agree to re-register and re-title the vehicle in your name no later than 30 days from the date you purchase it. If you fail to do so, we reserve the right to re-register and re-title the vehicle.

a. **Scheduled Termination.** At the end of the scheduled Lease Term, you may purchase the vehicle "as is" for the amount set forth in section 9 of this lease plus any lease payments or other amounts due under the lease at the time of termination.

b. **Before Scheduled Termination.** At any time before the scheduled Lease Termination date, you have an option to purchase the vehicle "as is" for the Early Purchase Option Price (described below).

1) **Standard Lease - Early Purchase Option Price.** If this is a Standard Lease as indicated on the front of the lease, the Early Purchase Option Price is the sum of: (a) lease payments and other amounts that are due or past due at the time of termination; (b) all fees and taxes assessed or on billed in connection with this lease or the vehicle; (c) the Adjusted Lease Balance (explained below); and (d) the Purchase Option Fee provided in section 9 on the front of the lease.

The **Adjusted Lease Balance** is calculated by reducing the Adjusted Capitalized Cost each month, on each monthly payment due date, by the difference in the base monthly payment and the part of the rent charge earned in that month calculated on a constant yield basis.

2) **Single Payment Lease - Early Purchase Option Price.** If this is a Single Payment Lease as indicated on the front of this lease, the Early Purchase Option Price is the sum of: (a) past due amounts at the time of termination, plus the Purchase Option Fee as shown in section 9 on the front of this lease; plus (b) the Actual Early Purchase Option Price which is the amount set forth in section 9 on the front of this lease plus (c) all fees and taxes assessed or on billed in connection with this lease or the vehicle, plus (d) the Residual Value of the vehicle as set forth in this lease.

## 22. Return of Vehicle

a. **Scheduled Termination.** If this lease is not terminated early and you do not purchase the vehicle, you will, at Lease End: (1) return the vehicle to us at the end time and place we specify, at your expense, (2) complete and sign a final odometer statement and, if not already signed, the vehicle condition report; (3) pay the following amounts: (a) any amount owed for excess wear and use (explained in section 22.e.); plus (b) all lease payments and other amounts that are due or past due under the lease at the end of the term; plus (c) the Disposition Fee, unless you have purchased the vehicle or re-leased another Mercedes-Benz vehicle from us. The Disposition Fee covers the costs of preparing the vehicle for sale. The Disposition Fee is $595.00 and will be shown in section 9 on the front of the lease. For states where the Disposition Fee is less, the amount charged will not exceed the amount permitted by law. The Disposition Fee will not be charged in any state that prohibits the charging of such fee at Lease End and we will not attempt to collect the vehicle which you have returned to us where state law does not permit such charges. All the amounts listed above are in addition to any excess mileage charges that are owed.

b) **Standards for Excess Wear and Use.** Unless you are charged an Early Return of Vehicle Charge determined by Calculation A or C in section 22.b. of this lease, you may be responsible for and we will charge you for excess wear and use. Excess wear and use includes a charge for any miles driven in excess of the Mileage Allowance (described in section 22.d.). Excess wear and use includes the result of excess wear and use, whether or not we actually repair the vehicle, except where the vehicle is not roadworthy, including: (a) broken or missing parts; (b) tires or brakes worn beyond legal limits; (c) dents, scratches, chips, cuts, tears, burns, rust or other damage to the body, fenders, metalwork, lights, trim or paint, including but not limited to dents or rust; (d) damaged or stained dash, floor covers, seats, or any other part of the interior; (e) non-OEM glass or other glass damage; (f) mechanical, electrical or other functional defects; (g) damaged or broken equipment, or components including internal battery equipment, keys or remote keyless entry devices, lost kits, or anything else that is required to be returned with the vehicle. You understand that this definition of excess wear and use includes, but is not limited to, any item of wear, damage, or condition that both: (i) is listed on the vehicle condition report; and (ii) the cost to repair the item exceeds $250. You understand we have the right to: (i) inspect the vehicle at Lease End; and (ii) after such inspection, to charge you any part of the vehicle's condition or value at the time of any part of the vehicle's condition report, including any such alteration performed at your request prior to being delivered, or not performed other damage to the interior or exterior that is beyond ordinary wear and use.

c. **Early Termination by You.** If you are not in default and you terminate the vehicle, you may terminate this lease at any time. If you terminate your lease before the scheduled Lease Term, you must return the vehicle to us and pay your Early Termination Liability. The following formula will be used to compute the Early Termination Liability:

1) **Standard Lease - Early Return of Vehicle Charge.** If this is a Standard Lease, your liability is determined by Calculation A or Calculation B, whichever is less.

**Calculation A:** (1) All unpaid Monthly Payments that have accrued up to the date of termination; **plus** (2) All other unpaid amounts, other than excess wear and use and mileage charges, due under the lease (including, but not limited to, all fees that are past due), to the extent of loss of the vehicle's Residual Value at termination; **plus** (3) the Vehicle Turn-in Fee; **plus** (4) any unpaid amount for excess wear and use, and mileage fees if applicable, computed as of the date of termination.

**Calculation B:** (1) All Monthly Payments not yet due under the lease; **plus** (2) all unpaid Monthly Payments that have accrued up to the date of termination; **plus** (3) All other unpaid amounts, other than excess wear and use and mileage charges (including, but not limited to, all fees that are past due), due under the lease; **plus** (4) the Vehicle Turn-in Fee; **plus** (5) any amount for excess wear and use, which includes a charge for excess mileage.

2) **Single Payment Lease - Early Return of Vehicle Charge.** If this is a Single Payment Lease, as indicated on the front of this lease, your Early Return of Vehicle Charge is determined by Calculation C or Calculation D, whichever is less.

**Calculation C:** (1) All unpaid amounts due under the lease, other than excess wear and use and mileage charges (including, but not limited to, all fees that are past due and taxes related to the lease or the vehicle in connection with lease termination); **plus** (2) the Vehicle Turn-in Fee; **plus** (3) Any amount determined by subtracting the vehicle's Residual Value from the Adjusted Capitalized Cost; **plus** (4) any unearned rent charges that you paid, calculated on a constant yield basis. If the Market Wholesale Value exceeds the Residual Value, the excess amount will be subtracted from your liability.

**Calculation D:** (1) All Monthly Payments not yet due under the lease; **plus** (2) All unpaid amounts due under the lease, other than excess wear and use charges and mileage charges (including, but not limited to, all fees and taxes related to the lease or the vehicle in connection with lease termination); **plus** (3) the Vehicle Turn-in Fee; **plus** (4) any amount for excess wear and use, which includes a charge for excess mileage.

**Calculation C:** (1) All amounts due under the lease, other than excess wear and use and mileage charges (including, but not limited to, all official fees and taxes related to the lease or the vehicle in connection with lease termination); **plus** (2) The Vehicle Turn-in Fee; **plus** (3) any amount determined by subtracting the vehicle's Residual Value from the Adjusted Capitalized Cost; **plus** (4) any unearned rent charges that you paid, calculated on a constant yield basis. If the Market Wholesale Value exceeds the Residual Value, the excess amount will be subtracted from your liability.

3) **Fair Market Wholesale Value.** The Fair Market Wholesale Value will be determined in one of the following ways: (a) within 3 days of the scheduled date of disposition, you may obtain, at your own expense, from an independent third party agreeable to both you and us, a professional appraisal of the wholesale value of the vehicle which could be realized at sale. The appraised value shall be final and binding and shall be used as the Fair Market Wholesale Value; (b) by the amount paid for the vehicle's purchase/ acceptance at a commercially reasonable manner; (c) if we retain ownership of the vehicle, the wholesale value of the vehicle as specified in the current edition in a recognized used vehicle value guide customarily used by automotive dealers to determine value in the state where you returned the vehicle; (d) by the amount we actually sell the vehicle for if it is sold (less (i) the amount of any proceeds we receive from your required insurance, plus (ii) the amount of your deductible under such insurance if that amount has been paid to us; if there are no maximum proceeds under (a) above, the Fair Market Wholesale Value will be zero.

## 23. Default

a. **Early Termination by Us.** We may terminate this lease at anytime if you are in default (see section 23.b.) and you must pay us your Early Termination Liability. Your Early Termination Liability equals all expenses related to recovering, obtaining and selling the vehicle, including legal fees and costs, (where permitted by law), reasonable attorney fees, collection costs, and court costs, to the extent not prohibited by law. **plus** ( ) if you are a Standard Lease as indicated on the front of this lease, the amount determined by Calculation A in section 22.b.; or (2) if this is a Single Payment Lease as indicated on the front of this lease, the amount determined by Calculation C in section 22.b.

b. **Events of Default.** You will be in default if: (1) you fail to make any payment when due, including any amount required to be paid under the provisions of this Lease entitled RETURN OF VEHICLE, Scheduled Termination or Early Termination by you; (2) you break any promise in conditions of this lease or any other agreement with us; (3) you fail to maintain the insurance we or applicable law require insurance; (4) you fail to return the vehicle as we specify; (5) you gave false or misleading information to us or your credit application; (6) you die, are declared incompetent, become bankrupt, (insolvent) or have an action filed by or against you; (7) the vehicle is seized, or levied on by court order or government action, or any of those assets; (8) anything of the vehicle is destroyed, abandoned, stolen or damaged beyond repair; (9) your driver's license expires or is suspended, revoked, or canceled; or (10) anything else happens that we reasonably believe in good faith endangers the vehicle or your ability to pay.

c. **Remedies for Default.** If you are in default, you will owe your Early Termination Liability provided above and we may exercise all remedies available at law. These remedies include: (1) terminate this lease and your rights to the vehicle; (2) take possession of the vehicle without prior demand, providing such repossession is done without breaching the peace; (3) require you to return the vehicle and make any repairs; (4) require you to pay all amounts due; (5) any reasonable action to prevent the default or our loss; (6) require you to return the vehicle to us at a location we specify; and (7) pursue any and all remedies available at law. If we retake the vehicle or if you return the vehicle to us, we may sell or otherwise use the vehicle, and apply any proceeds that we receive to reduce the amount you owe. To the extent we have at law or in equity, You agree to reimburse us for any loss we incur in retaking, storing, preparing for sale and selling the vehicle. You agree that in the event you are in default, we may recover the vehicle, and that to the extent required or permitted by applicable law, we will notify you of the intended action. If we dispose of the vehicle, the proceeds of any such disposition will be credited to your account to the extent permitted by law, after the payment of any deficiency. If we cover the default in any manner and you remain in default or in any manner default again.

## 24. Interest on Unpaid Amounts

You understand and agree that upon termination of this lease for any reason, if you do not pay us any amounts you owe, we may assess interest on the unpaid amount. The amount unpaid, interest on such amount at the annual rate of 6% or such lesser rate than the maximum rate as permitted by law.

## 25. Assignment and True Lease

You understand that this is a true lease and that you do not have equity or other ownership rights in the vehicle unless you purchase it from us. You may not assign, sell, sublease or arrange an assumption of your interests or rights under this lease or in the vehicle without our written permission. You understand that we may assign or transfer all or part of our rights under this lease to a third party (Assignee). When the assignment is made, we will notify you. You agree that an assignee or transferee is entitled to the full protection provided to Lessor under this Lease. You understand that, upon such assignment, the Assignee will step into our shoes and will have all of our rights hereunder. You agree to pay all amounts to the Assignee when we assign this lease and agree to pay us or any assignee for all amounts you owe. You agree that you receive any notice you are required to receive under this lease and you are to receive, the Assignee will be entitled to receive any such notice you are required to provide to us, and you will send us any notice at the address on the front of this lease unless we advise you otherwise in writing.

## 26. Late Charges/Returned Payment and Other Fees; Fines and Tickets

If we do not receive the entire amount of your Monthly Payment within 10 days after it is due, you will pay a late fee of $50 or 5% of the unpaid amount whichever is less. If any check, draft, order or other means of payment is returned or us for any reason, or if any authorized electronic debit is not paid, you will pay us a fee of $25. You agree to pay all fines and tickets imposed on the vehicle or on driver. If you do not pay such fines or tickets, and we pay, you agree to reimburse us for those amounts plus a $25 fee to the extent permitted by law. Unless prohibited by applicable law, you agree to pay a processing fee in connection with any payment you make to us by telephone. If you voluntarily surrender the vehicle during the lease, or if we legally take back the vehicle, or you fail to make any payment due, or fail to perform under this lease or to return the vehicle when required, or if you fail to make any required payment, we may assess an administrative fee to cover our costs incurred. When the vehicle is returned or repossessed, any processing fee will be charged as permitted by law.

## 27. Indemnification

You will defend, indemnify and hold harmless Lessor and Assignee from and against any loss and all losses or damages to the vehicle and from all claims, losses, suits, actions, liabilities, expenses including attorney's fees (where permitted by law), for fines and related to or arising out of or in connection with your possession, operation, use or condition of the vehicle. You will not be responsible for any loss caused by the sole negligence or willful misconduct of Lessor or Assignee.

## 28. Notices/General

We will send notices and correspondence to you at the billing address you provided on this lease. If this address or the garaging address changes, you will inform us, in writing, within 30 days of the change. You agree that any information you provide to us in connection with this lease may be shared as permitted by law. You authorize us and our assigns to release any of the information in this lease and our determination that the amounts you owed at the end of this lease have been paid in full. If we have not provided a required notice at least 30 days before exercising our rights, you will be responsible to pay us any amounts we are required to give you and any notices you are required to give to us.

## 29. Refundable Security Deposit

If a Security Deposit is required to be paid by you at the time of entering into this lease, the amount will be shown in Section 9 of this lease. You will not earn any interest on the Security Deposit. We may use the Security Deposit to pay off any amounts you owe us under this lease or any other agreement you have with us or our assigns. If this lease is not in default, we will return any part of the Security Deposit to you within 60 days of the end of the lease or the date you return the vehicle to us, whichever is later, minus any amounts that you owe us. We will apply the Security Deposit to any amounts owing. You agree that we may apply the amount of your Security Deposit to any amount you may owe, and will not be required to return any part of your Security Deposit until all amounts are paid. If you are not in default, we will return your Security Deposit to you after deducting amounts you owe us.

## 30. Modification

Any change to this lease must be in writing and signed by Assignee, however, if permitted by law, extensions, deferrals, or due date changes may be agreed to orally by you and us.

## 31. Enforceability

Each person who signs this lease is jointly and severally liable under this lease and for all payments, whether or not we try to collect from the other signers. We do not have to repossess the vehicle to enforce any part of our rights. We do not give up any of our rights by delaying or failing to exercise them. This lease is subject to the laws of the state where it was signed. This lease is the entire agreement between you and us and is governed by the laws of the state where you signed it. If a provision of this lease cannot be enforced, the provision remains valid, and the rest of the lease is enforceable. Any agents or sales people or other party cannot add or change any of the terms of this lease. If any provision of this lease is held invalid or unenforceable, such provision shall be enforceable to the maximum extent possible, and all remaining provisions shall continue in full force and effect.

## 32. Delivery

You accept delivery of the vehicle described in this lease and acknowledge that it is equipped as described, that is in good condition, and that you have examined it. You have inspected the vehicle, found it in good condition, and accepted it as is. You have read the odometer reading and found it to be accurate. You acknowledge reviewing and receiving a completely filled-in copy of this lease in addition to this booklet.

## 33. Payment Obligations

You may not change or stop any lease payments for **any reason**, even if you are: dissatisfied with the vehicle; have a claim against the manufacturer; or have a dispute with us or the government or a court, experiences mechanical problems, or have any disagreements concerning the lease or the vehicle. You will pay the amounts due under the lease when due, even if the vehicle needs service or is destroyed. If any payment received or applied is avoided, set aside, or returned for any reason, person, the indebtedness to which the payment was applied shall be reinstated. In no event shall the payment obligations of any Lessee be considered satisfied until all amounts owed are paid in full. Your obligations to pay will continue until all amounts due and owing under the lease are paid in full.

## 34. Taxes, Registration and Titling

We agree to title and register the vehicle in the state in which you provide as your garaging address and in our name as the owner, or as our assignee designates. You agree to pay all titling, licensing, registration, and documentation fees in connection with the vehicle, and all taxes, including all personal property taxes, assessed on the vehicle or this lease. You will be responsible for any taxes, fees, and charges arising out of this lease. If applicable taxes relating to the lease are increased during the term of the lease, your monthly payment or other amounts due may be adjusted to reflect the increase. You agree to pay any personal property or use taxes that may be assessed against the vehicle during the term of this lease. If you fail to pay any of the above amounts, you will be in default under this lease.

## 35. Security Interest

You grant a security interest, to the extent permitted by law, in the following, to secure performance of your lease obligations: (1) proceeds of any insurance with respect to the vehicle; (2) proceeds of any optional service, maintenance, or other contract purchased with this lease; and (3) any refunds, credits, or rebates that may be due at any time.

The terms, conditions, if any, under which you intend to pay off amounts that you owe under this lease, if you are in default, or terminate early, may be applied toward your early termination liability, or toward any other amounts you owe. You agree to cooperate with us by executing any further documents we may require to perfect our security interest and will pay any costs incurred.

## 36. Power of Attorney

You appoint us, as the extent permitted by law, to act as your attorney-in-fact to do the following on your behalf: (1) sign your name, endorse checks, and execute and file documents including, but not limited to, titles and registration documents, insurance documents, and vehicle condition and inspection reports that are needed to perform under this lease or protect our rights in the vehicle; (2) endorse and deposit any insurance or warranty refund checks; and (3) sign and file any documents that are needed to perform under this lease.

---

# VEHICLE LEASE CONSENT

## VEHICLE LEASE CONSENT

For Mercedes-Benz Vehicles: Notwithstanding anything in the Mercedes-Benz Financial Services Lease Agreement (the "Lease Agreement") to the contrary, you authorize us, and our assignee, Mercedes-Benz Financial Services USA LLC, or any successor or assign (collectively, or individually, "we," "us," or "our") and agree that the vehicle that is the subject of the Lease Agreement, and any replacement vehicle (the "Vehicle"), may be, at our option and expense, equipped with a device or electronic system that uses one or more technologies to collect, record, transmit, analyze, and/or store data and other information, including, but not limited to, Vehicle diagnostic, operational, location, performance, and utilization data, whether gathered by the Vehicle's on-board diagnostic system, telematics, or otherwise (collectively, "Vehicle Data"). You agree that we, and any affiliates, agents, representatives, and affiliates (including Mercedes-Benz USA, LLC ("MBUSA") and any of its affiliates, agents, representatives, service providers, and business partners), may access, collect, record, use, transmit, and/or store Vehicle Data for any purpose, including, but not limited to: (i) providing you with vehicle or roadside assistance services; (ii) notifying you of any recall or safety-related information; (iii) verifying compliance with the terms and conditions of the Lease Agreement; (iv) locating, tracking, immobilizing, disabling, repossessing, and/or recovering the Vehicle; (v) improving the Vehicle and related products and services; and (vi) any other purpose we deem appropriate, including for marketing purposes. You understand and agree that we may disclose Vehicle Data to third parties, including, but not limited to, our affiliates, agents, representatives, service providers, and business partners, and to any governmental authority as required by law or legal process. You further understand and agree that we and our affiliates may use any information and technology to locate, track, immobilize, disable, and/or recover the Vehicle, and you hereby consent to such use.

Our ability to collect, record, transmit, analyze, and/or store Vehicle Data may depend on the Vehicle's on-board technology and telematics capabilities, and the availability of cellular, satellite, GPS, or other communication networks and services. We do not guarantee that any such technology, networks, or services will be available at all times or in all locations, or that the Vehicle Data will be accurate, complete, or timely.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, you, on behalf of you, your representatives, successors, and assigns, forever release, discharge, and indemnify us, and our respective affiliates, agents, representatives, successors, and assigns, from and against any and all claims, losses, damages, liabilities, costs, expenses, debts, liens, suits, actions, and causes of action, in law or in equity, of any kind, character, or nature whatsoever, known or unknown, that arise out of or relate in any way to the collection, recording, transmission, analysis, storage, use, or disclosure of Vehicle Data, or the use of any technology to locate, track, immobilize, disable, or recover the Vehicle.

You knowingly and intentionally waive and release any and all rights or claims in connection with the subject matter of this consent to the extent permitted by law, and you agree that this consent shall be binding upon you and your representatives, successors, and assigns, and shall inure to the benefit of us and our respective affiliates, agents, representatives, successors, and assigns. This consent shall be governed by the laws of the state in which you signed the Lease Agreement, and shall be subject to the same terms, conditions, and provisions set forth in the Lease Agreement, including, but not limited to, those relating to assignment, governing law, and enforceability.

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**