Robert L. Starr (183052)
robert@starrlaw.com
Adam M. Rose (210880)
adam@starrlaw.com
Theodore R. Tang, Esq. (313294)
theodore@starrlaw.com
THE LAW OFFICE OF ROBERT L. STARR, APC
23901 Calabasas Road, STE #2072
Calabasas, CA 91302
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Attorneys for Plaintiff
Calabasas Luxury Motorcars

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALABASAS LUXURY MOTORCARS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MERCEDES-BENZ USA, LLC; MERCEDES-BENZ FINANCIAL SERVICES USA, LLC; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: 2:21-cv-08805-FMO-AS <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT MERCEDES-BENZ USA'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................. 3-6

I.   INTRODUCTION .......................................................................... 7

II.  RELEVANT FACTUAL ALLEGATIONS ................................... 7

III. LEGAL STANDARD .................................................................... 11

IV.  ARGUMENT ................................................................................. 12

(A) THE INTRA-CORPORATE IMMUNITY DOCTRINE IS INAPPLICABLE TO CONSPIRACIES WHICH DO NOT INVOLVE THE PARENT CORPORATION . 12

(B)  PLAINTIFF SPECIFICALLY ALLEGED THE ADVERSE EFFECTS OF MBUSA'S ANTICOMPETITIVE CONDUCT ................................... 15

(C)  MBUSA'S ARGUMENT RELATED TO PROHIBITIONS ON ASSIGNMENT IS IRRELEVANT  REASON BECAUSE THERE WAS NEVER AN ASSIGNMENT OF RIGHTS ................................................................................. 18

(D)  PLAINTIFF PROPERLY ALLEGED A CLAIM UNDER THE UNFAIR AND UNLAWFUL PRONGS OF THE UCL ........................................... 19

(1) *The "Unlawful" Prong is Satisfied by Allegations of MBUSA's Anticompetitive Conduct* ........................................................ 19

(2) *Under Any Form of Recognized Legal Analaysis, MBUSA's Alleged Conduct Was Categorically "Unfair"* ................................... 20

(a) MBUSA's Conduct is Unfair Under the Balancing Test ............. 21

(b) MBUSA's Conduct is Considered Unfair Under the Tethering Test ............................................................................................ 22

(c) MBUSA's Conduct is Considered Unfair Under the "Section 5" Test ............................................................................................ 23

V.   CONCLUSION ............................................................................. 24

1

# TABLE OF AUTHORITIES

2

**FEDERAL CASES**                                                              **PAGE**

3
4
*Alig v. Quicken Loans, Inc.*
2016 U.S.Dist.LEXIS 194382 (N.D. W.Va. 2016)......................................12-13

5
6
*Am. Needle, Inc. v. National Football League*
560 U.S. 183 (2010) ........................................................................ 14

7
8
*Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*
890 F.3d 445 (3d Cir. 2018) ........................................................18-19

9
10
*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ........................................................................ 12

11
12
*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) ........................................................................ 12

13
14
*Bryson v. Gonzales*
534 F.3d 1282 (10th Cir. 2008) .................................................... 12

15
16
*Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters*
497 F.3d 972 (9th Cir. 2007)........................................................11-12

17
18
*Cont'l T.V., Inc. v GTE Sylvania Inc.*
433 U.S. 36 (1977) .......................................................................... 16

19
20
*Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*
911 F.2d 242 (9th Cir. 1990)........................................................... 15

21
22
*Copperweld Corp. v. Independence Tube Corp.*
467 U.S. 752 (1984) ................................................................... 12, 13

23
24
*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*
236 F.3d 1148 (9th Cir. 2001)......................................................16-17

25
26
*Daimler AG v. Bauman*
571 U.S. 117 (2014) ........................................................................ 14

27
28
*Dole Food Co. v. Patrickson*
538 U.S. 468 (2003) ...................................................................13-14

*FTC v. Indiana Fed'n of Dentists*
        476 U.S. 447 (1986) ................................................................. 16

*MacDermid Printing Solutions LLC v. Cortron Corp.*
        833 F.3d 172(2d Cir. 2016) ....................................................... 17

*McHenry v. J P Chase Morgan Bank NA*
        2021 U.S.Dist.LEXIS 14857 (W.D. La. 2021) ................................ 13

*Moss v. U.S. Secret Service*
        572 F.3d 962 (9th Cir. 2009) ..................................................... 12

*Nat'l Soc. of Professional Engineers v. United States*
        435 U.S. 679 (1978) ................................................................. 16

*NCAA v. Board of Regents*
        468 U.S. 85 (1984) ................................................................... 16

*Newport Components, Inc. v. NEC Home Electronics, Inc.*
        671. F.Supp 1525 (C.D. Cal. 1987) ............................................. 13

*Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*
        472 U.S. 284 (1985) ................................................................. 16

*PNY Techs., Inc. v. SanDisk Corp.*
        2012 U.S.Dist.LEXIS 55965 (N.D.Cal. 2012) ................................ 17

*In re Ray Dobbins Lincoln-Mercury v. Ford Motor Co.*
        604 F.Supp. 203 (W.D. Va. 1984) ............................................... 13

*Ronconi v. Larkin*
        253 F.3d 423 (9th Cir. 2001) ..................................................... 12

*Texaco Inc. v. Dagher*
        547 U.S. 1 (2006) .................................................................... 16

**STATE CASES**

*Barquis v. Merchs. Collection Ass'n of Oakland, Inc.*
        7 Cal.3d 94 (1972) ............................................................... 20-21

*Californians for Population Stabilization v. Hewlett-Packard Co.*
58 Cal.App.4th 273 (1997)............................................................19-20

*Camacho v. Automobile Club of Southern California*
142 Cal.App.4th 1394 (2006)............................................................23

*Candelore v. Tinder, Inc.*
19 Cal.App.5th 1138 (2018)..........................................................21-22

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*
20 Cal.4th 163 (1999) ........................................................... 19, 20, 22

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*
35 Cal.3d 197 (1983)............................................................ 19

*Consumers Union of United States, Inc. v. Fisher Dev., Inc.*
208 Cal.App.3d 1433 (1989)............................................... 19

*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*
4 Cal.3d 842 (1971)........................................................ 17

*Exxon Corp. v. Superior Court*
51 Cal.App.4th 1672 (1997)............................................ 16

*Farmers Ins. Exch. v. Superior Court*
2 Cal.4th 377 (1992)..................................................... 19

*Macmanus v. A. E. Realty Partners*
146 Cal.App.3d 275 (1983)........................................... 14

*Marin County Bd. of Realtors, Inc. v. Palsson*
16 Cal.3d 920 (1976)..................................................... 16

*Motors, Inc. v. Times Mirror Co.*
102 Cal.App.3d 735, 740 (1980) .................................... 20

*Nationwide Biweekly Admin., Inc. v. Superior Court*
9 Cal.5th 279 (2020)...................................................... 21

*People v. Nat'l Assoc. of Realtors*
120 Cal.App.3d 459 (1981)............................................ 17

*Rubenstein v. The Gap, Inc.*
14 Cal.App.5th 870 (2017) ................................................................. 23

*Smith v. State Farm Mutual Automobile Ins. Co.*
93 Cal.App.4th 700 (2001) ................................................................. 21

*Speegle v. Board of Fire Underwriters*
29 Cal.2d 34 (1946) ........................................................................... 20

*State Farm Fire & Cas. Co. v. Superior Court*
45 Cal.App.4th 1093 (1996) .............................................................. 20

**STATUTES**

15 U.S.C. § 1 ...................................................................................... 16

Cal. Bus. & Prof. Code § 16720 ....................................................... 23

Cal. Bus. & Prof. Code § 17200 ................................................. *passim*

Cal. Civil Code § 2987 ................................................................... 7, 11

Cal. Vehicle Code § 11709.4 ...................................................... 7, 8, 11

## I.   INTRODUCTION

This case is about how Defendants Mercedes-Benz USA ("MBUSA") and Mercedes-Benz Financial Services ("MBFS") (collectively "Defendants"), through anticompetitive and monopolistic conduct, have inflicted severe economic harm to non-Mercedes vehicle dealerships throughout the State of California. Calabasas Luxury Motorcars ("Plaintiff") is one of those dealerships. Plaintiff filed suit against Defendants and then filed a First Amended Complaint ("FAC") alleging causes of action for violation of the Cartwright Act and California's Unfair Competition Law. In response, MBUSA has moved to dismiss. For the reasons explained below, the motion should be denied.

## II.   RELEVANT FACTUAL ALLEGATIONS

Plaintiff's First Amended Complaint ("FAC") alleged that due to the recent catapulting of prices for new and used cars, lessees whose lease terms have either not yet expired or are about to expire have found themselves in possession of vehicles whose market values—as calculated by California Civil Code § 2987—are worth significantly more than the amounts owed on their respective leases. [Dkt. # 20 at ¶¶ 25-26]. Due to this increased equity, consumers are recognizing that the resale value of their vehicles exceeds the vehicle's payoff price, and many consumers have thus sought to buy out the lease and sell/trade-in the car for a profit rather than turning the car over to MBUSA at the end of the lease. [*Id*. at ¶ 27]. According to the FAC, "[a] consumer's ability to trade in their Mercedes vehicle to a non-Mercedes franchise dealer is…necessary…in order to ensure a robust competitive market for consumers who wish to sell their vehicles as well as…***for non-Mercedes dealers*** who wish to purchase and sell Mercedes vehicles[,] and consumers who wish to purchase used Mercedes vehicles." [*Id*. at ¶ 33 (emphasis added)].

Pursuant to Cal. Civ. Code § 2987, consumers have a statutory right to terminate their lease early in connection with the purchase or lease of another vehicle. Cal. Vehicle Code § 11709.4 sets forth the procedures which must be

-7-

employed by a licensed vehicle dealer when a consumer wishes to exercise its right to trade-in the vehicle pursuant to Civ. Code § 2987. The FAC alleges that pursuant to both of these statutes, there must necessarily exist an implied statutory right in favor of licensed vehicle dealers to accept vehicle trade-ins, for if such were not the case, then there would be no need for these statutes in the first place. That is to say, if a licensed vehicle dealer did not have the right to accept trade-ins or engage in "third-party payoffs," then both Civ. Code § 2987 and Vehicle Code § 11709.4 would be rendered completely nugatory. [Dkt. # 20 at ¶¶ 36-38, 41].

Against the backdrop of a licensed vehicle dealer's statutory right to engage in third-party payoffs, the FAC alleges that as a result of a shortage in the supply of durable goods, Defendants have sought to place an unfair restraint on trade "by intentionally impeding and frustrating the ability of non-Mercedes franchise dealerships to accept leased…Mercedes vehicles as trade in vehicles[,] while simultaneously [and] intentionally impeding…the ability of consumers to sell their…leased Mercedes vehicles to non-Mercedes franchise dealerships." [*Id.* at ¶ 42]. For example, if a consumer whose lease is about to expire decides to trade in their leased Mercedes vehicle for a non-Mercedes brand vehicle, the non-Mercedes franchise dealer "is impeded and frustrated in its ability to accept the vehicle because MBUSA intentionally impedes and frustrates the ability of the non-Mercedes franchise dealerships from purchasing MBFS leased Mercedes vehicles as trade in vehicles." And the same holds true when "the consumer attempts to trade in the vehicle or sell the MBFS leased Mercedes vehicle to an independent used vehicle dealership." [*Id.* at ¶ 43]

Plaintiff alleges that MBUSA's intentional anti-competitive conduct is designed to force MBUSA customers to return their leased Mercedes only to Mercedes franchise dealerships and no one else. Therefore, if a consumer has leased a Mercedes vehicle and wants to end the lease early, they are now prevented from engaging in commerce with any non-Mercedes franchise dealerships and are instead

-8-

relegated to dealing strictly with Mercedes franchise dealerships. [*Id*. at ¶ 44]. By taking numerous steps to keep leased vehicles on the "Mercedes Merry-go-Round," Defendants have prevented non-Mercedes dealerships, such as Plaintiff, from exercising their right to purchase these leased vehicles as "trade-ins." [*Id*. ¶ 46]. Defendants accomplish this anticompetitive conduct by unlawfully refusing to allow consumers to trade in their leased vehicles to non-Mercedes franchise dealerships. [*Ibid*.].

In short, Defendants have colluded with each other and have tacitly or explicitly agreed to engage in this anticompetitive conduct for their own benefit by (1) ensuring to the greatest degree possible that only Mercedes dealership have access to MBFS-leased Mercedes vehicles after they are traded in or sold at the end of the lease term; and (2) ensuring Defendants, as well as Mercedes franchises, capture as much profit as possible by being able to designate the vehicles as "Certified Pre-Owned," which thereby allows Defendants to charge even more money during the invariable resale of the vehicle. [*Id*. at ¶¶ 52, 53].

Having alleged facts which, when taken as true, plausibly establish that Defendants' conduct is "in restraint of trade," Plaintiff further alleges that if "Defendants are allowed to continue to stifle the sale of used Mercedes vehicles at non-Mercedes franchise dealerships…California residents will, for the most part, only be able to purchase a previously-leased Mercedes vehicle from a Mercedes franchise dealership. [*Id*. at ¶ 54]. By engaging in these anticompetitive practices, "Defendants are seizing major control over the market of [used] Mercedes vehicles…because a large percentage of new Mercedes vehicles that are acquired by consumers in California are acquired through lease rather than purchase." [*Ibid*.].

Given the volume of previously-leased Mercedes vehicles which are bought, sold, and traded-in on annual basis in this State, Plaintiff alleges that the relevant market which is most negatively impacted by Defendants' anticompetitive conduct consists of "all non-Mercedes franchise vehicle dealerships in California whose right

to accept leased Mercedes vehicles as trade in vehicles and whose right to purchase MBFS-leased Mercedes vehicles has…or will in the future…be infringed upon and violated, and who have or will suffer damage, as a result of Defendants' unfair, unlawful, and anticompetitive conduct[.]" [*Id*. at ¶ 63].

As a result of the brazen manner in which Defendants have cornered the California market for used Mercedes vehicles, Plaintiff alleges that market competition between Defendants and Plaintiff will be substantially eliminated or substantially reduced, and prices for used Mercedes vehicles will rise to levels they would never have risen in the absence of Defendants' monopolistic and anticompetitive conduct. Moreover, consumers who wish to sell their leased Mercedes vehicles will have reduced options; will enjoy less competition for the purchase of their vehicles; and will thus receive less money when selling or trading in their leased vehicles. [*Id*. at ¶ 55].

With respect to the damage suffered, Plaintiff alleges that as a result of "the contract, combination, or conspiracy…among Defendants…to fix, raise, maintain, and stabilize the prices of, and allocate the market for and restrain trade relating to used Mercedes vehicles…Plaintiff and those similarly situated would never have faced these barriers to commerce or entrance into the market in the absence of Defendants'…anticompetitive conduct[.]" [*Id*. at ¶ 70, 73]. That is to say, the end result of Defendants' anticompetitive conduct "is that there is a reduced number of used Mercedes vehicles available on the market for purchase by non-Mercedes franchise dealers for resale." [*Id*. at 74].

In addition to violation of the Cartwright Act, Plaintiff alleges that Defendants' anticompetitive conduct is also violative of the "unfair" and "unlawful" prongs of California's Unfair Competition Law [Cal. Bus. & Prof. Code § 17200]. Defendants' conduct is "unfair" because in their attempt to restrain trade, they intentionally impede and frustrate Plaintiff's ability to exercise its statutory right to purchase a leased vehicle as a trade-in. [Dkt. # 20 at ¶ 85]. Despite the longstanding

existence of both a statutory right and industry custom in favor of allowing vehicle dealers to purchase leased vehicles as "trade-ins," Defendants' newfound business practice violates established public policy and is substantially injurious to consumers such as Plaintiff who are being prevented from exercising their statutory and common law rights. [*Id*. at ¶ 86].

Importantly, a sizable portion of Plaintiff's business model revolves around dealing with those vast majority of consumers who either lack the desire or liquidity to pay off their leased vehicles and sell them on their own. But now, as a result of Defendants' wrongful conduct, MBUSA lessees who wish to terminate their lease early or capture any of the equity in their lease are forced to do so at a Mercedes franchise dealership alone. This not only unfairly prevents consumers from having free choice but, most relevant here, it also "restrain[s] trade and unfairly prevents non-Mercedes franchise dealerships from being able to purchase MBFS leased Mercedes vehicles." [*Id*. at ¶ 86]. Plaintiff further alleges that Defendants' business practices are unfair because their conduct is tethered to their interference with Plaintiff's statutory rights pursuant to Vehicle Code § 11709.4 and Civil Code § 2987. [*Id*. at ¶ 88].

Finally, the FAC alleges that Defendants' conduct violates § 17200's "unlawful" prong because Defendants' conduct "impos[es] unfair and unreasonable restrictions on a non-Mercedes…dealer's right to accept the vehicle as a trade in." Similarly, MBUSA intentionally impedes and frustrates the ability of MBUSA leased Mercedes vehicles to be sold to non-Mercedes franchise dealers…at the end of the lease and the only actual reason that Defendants engage in such conduct is to gain an unfair advantage in the marketplace. [*Id*. at ¶ 101].

## III.   LEGAL STANDARD

The legal methodology for ruling on a motion to dismiss requires the court to assume all well-pled facts to be true and to draw all reasonable inferences in favor of the non-moving party. [See, *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters*,

497 F.3d 972, 975 (9th Cir. 2007)]. When reviewing the complaint, the Court must not read each allegation in isolation, but instead must read it "as a whole" and its parts in their context. [See, *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)]. A complaint need only allege sufficient facts to show "a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)]. Assessing plausibility does not involve analysis of the merits. [*Id.* at 556-57].

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]. "This is not to say that the factual allegations must themselves be plausible; after all, they are assumed to be true. It is just to say that relief must follow from the facts alleged." [*Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008); see also, *Moss v. U.S. Secret Service*, 572 F.3d 962, 970 (9th Cir. 2009) ("When there are well pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.")]. To the extent the pleadings fail to state a claim, the court should grant leave to amend if these insufficiencies can be cured by additional facts. [*Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted)].

## IV.   ARGUMENT

### (A)   THE INTRA-CORPORATE IMMUNITY DOCTRINE IS INAPPLICABLE TO CONSPIRACIES WHICH DO NOT INVOLVE THE PARENT CORPORATION

According to MBUSA Plaintiff is not allowed to assert a Cartwright conspiracy claim against commonly owned affiliates. [Dkt. #23 at 14]. MBUSA's argument is reflective of its fundamental misunderstanding of the intra-corporate immunity doctrine.

It is well-settled that conspiracy claims against both a parent and child corporation are prohibited under anti-trust law. [See, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768-69 (1984)]. At the same time, "there is

no prohibition on claims for conspiracy between or among 'sister' or related companies[.]" [*Alig v. Quicken Loans, Inc*. 2016 U.S.Dist.LEXIS 194382, at \*70-71 (N.D. W.Va. 2016) (citing *In re Ray Dobbins Lincoln-Mercury v. Ford Motor Co.*, 604 F.Supp. 203, 205 (W.D. Va. 1984).)]. In the case of *Ray Dobbins*, the Court made crystal clear that *Copperweld* does not apply to allegations of conspiracy which only allege the involvement of two subsidiaries and not the parent. [See, *Ray Dobbins*, 604 F.Supp. at 205]. As a point of emphasis, *Ray Dobbins* was cited with approval by this very Court in *Newport Components, Inc. v. NEC Home Electronics, Inc.*, 671. F.Supp 1525 (C.D. Cal. 1987).

In *Newport Components*, this Court explained that had Newport alleged a conspiracy between two sister corporations, then its case would have been more akin to *Ray Dobbins*, and Newport's antitrust allegations would have survived dismissal. The Court clarified, however, that "[u]nlike the situation in *Ray Dobbins*, the parent corporation here, NEC, remains an 'alleged co-conspirator' in the case and, according to [Newport]'s complaint, actually directed the conspiracy in which its subsidiaries allegedly participated…Accordingly, the Court finds plaintiff's [reliance on *Ray Dobbins*] to be without merit." [*Newport Components*, 671 F.Supp. at 1544, fn. 25].

Identical to the circumstances in *Ray Dobbins*, and in contrast to the circumstances in *Newport Components*, the Plaintiff in this case has alleged a conspiracy between MBUSA and MBFS and has made absolutely no mention or reference to Defendants' parent corporation. Notably, Defendants acknowledge that they are both "***indirect subsidiaries*** of Daimler AG." [Dkt. # 23 at 10 (emphasis added)]. Yet, "the words direct and indirect subsidiaries, given their plain meaning, would mean entities owned by [the parent] (direct subsidiaries) or owned by subsidiaries of [the parent] (indirect subsidiaries)." [*McHenry v. J P Chase Morgan Bank NA*, 2021 U.S.Dist.LEXIS 14857, at \*9 (W.D. La. 2021)]. "A corporate parent [who] owns the shares of a subsidiary does not, for that reason alone, own or have

legal title to the assets of the subsidiary; and it follows with even greater force [that] the parent does not own or have legal title to the subsidiaries of the subsidiary." [*Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)].

The "single entity test" or "intraenterprise conspiracy test" is "easily satisfied when corporate policies are set by one individual or by a parent corporation to the extent there is no autonomy. At the other extreme, jointly owned corporations that…set policy independently[] are capable of conspiring to restrain trade as distinct entities." [*Macmanus v. A. E. Realty Partners*, 146 Cal.App.3d 275, 287 (1983) (citations omitted)]. The key to the proper application of the intra-corporate immunity doctrine is not whether the Defendants can technically be linked to one single corporate entity, or that they claim to share a unity of interest. Instead, "[t]he relevant inquiry…is whether there is a contract, combination or conspiracy amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decision making, and therefore of diversity of entrepreneurial interests." [*Am. Needle, Inc. v. National Football League*, 560 U.S. 183, 195 (2010)].

In reference to Defendants and their parent corporation, the United States Supreme Court has explained that "[t]he relationship between Daimler and MBUSA is delineated in a General Distributor Agreement, which sets forth requirements for MBUSA's distribution of Mercedes-Benz vehicles in the United States. That agreement establishe[s] MBUSA ***as an independent contractor that buys and sells vehicles…as an independent business for its own account***…[and] MBUSA has ***no authority*** to make binding obligations for or act on behalf of DaimlerChrysler *or any* DaimlerChrysler Group Company." [*Daimler AG v. Bauman* 571 U.S. 117, 123-124 (2014) (emphasis added)].

In light of the Supreme Court's direct reference to Daimler and MBUSA as separate and independent businesses with their "own account[s]," it strains credulity for MBUSA—which is a vehicle manufacturer—to somehow contend that it is not a

1  separate economic actor from MBFS—which is a lending institution. Indeed, upon

2  engaging in even the most cursory review of Daimler's corporate structure, it

3  becomes readily apparent that not only are MBUSA and MBFS sister corporations,

4  but they are sister corporations which are twice removed from their connection to

5  Daimler. In other words, because Defendants are each owned by separate

6  subsidiaries of Daimler, it must follow "with even greater force" that the parent does

7  not hold control over the subsidiaries of the subsidiary. [*See, e.g., Dole*, 538 U.S. at

8  475]. More fundamentally, MBUSA does not present any evidence which would

9  support that Daimler controlled any of its indirect subsidiaries, or that Daimler

10  exerted so much control over MBFS and MBUSA as indirect subsidiaries, that

11  MBFS and MBUSA should be viewed as being identical economic actors with

12  identical economic interests.

13      In sum, MBUSA's reliance on *Copperweld* is misplaced. MBUSA and MBFS

14  are indirect sister subsidiaries engaged in separate areas of commerce. They are

15  separate economic actors that are fully capable of engaging in a conspiracy. The

16  FAC not only alleged a contract, combination, or conspiracy amongst these separate

17  economic actors, but further alleged that the "result of this illegal anticompetitive

18  activity is that there is a reduced number of used Mercedes vehicles available on the

19  market for purchase by non-Mercedes franchise dealers for resale" and that "[s]uch

20  conduct stifles competition, harms consumers, and harms the putative class." [Dkt. #

21  20 at ¶ 74]. For this initial reason, MBUSA's motion should be denied.

22      **(B)  PLAINTIFF'S SPECIFICALLY ALLEGED THE ADVERSE EFFECTS OF**

23          **MBUSA'S ANTICOMPETITIVE CONDUCT**

24      Alternatively, MBUSA argues that Plaintiff's Cartwright Act claim should be

25  dismissed because "Plaintiff does not adequately allege a substantially adverse effect

26  on competition in the relevant market" because there are no allegations to suggest

27  that MBUSA's anticompetitive conduct "substantially impacts competition in the

28  used car market as a whole." [Dkt. # 23 at 16-17]. MBUSA's argument is completely

unsupported by relevant California law.

Under federal law, Section 1 of the Sherman Antitrust Act prohibits "**every** contract, combination…or conspiracy…in restraint of trade." [15 U.S.C. § 1 (emphasis added)]. In reality, courts have "not taken a literal approach to this language." [*Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)]. Instead, the Supreme Court has consistently limited the reach of Section 1 to "unreasonable" restraints of trade. [*See, e.g., Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985)]. Like its federal counterpart, the Cartwright Act does not prohibit all agreements which restrain trade, but only those agreements which "unreasonably" restrain trade. [*See, Marin County Bd. of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 930-931 (1976)].

The Supreme Court has defined unreasonable restraints on trade as those which raise prices; reduce output; reduce quality; diminish consumer choice; or enhance market power. [*NCAA v. Board of Regents*, 468 U.S. 85, 112-113 (1984); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986)]. To determine whether a restraint is unreasonable, courts employ either a "*per se*" analysis, or a "rule of reason" analysis. The *per se* analysis is reserved for those restraints which are so clearly anticompetitive "as to render unjustified further examination of the challenged conduct." [*NCAA*, 468 U.S. at 103-104 (1984); see also, *Cont'l T.V., Inc. v GTE Sylvania Inc.*, 433 U.S. 36, 49-50 (1977)]. Because the allegations here involve a vertical restraint, the allegations of anticompetitive conduct must evaluated under a "rule of reason" analysis. [See, *Exxon Corp. v. Superior Court*, 51 Cal.App.4th 1672, 1680–1681 (1997)].

The "rule of reason" analysis requires review of the trade restraint's actual effect on competition within a defined market. The ultimate determination that must be made under a rule of reason analysis is simple to state—it is whether the challenged activity promotes competition or suppresses it. [*Nat'l Soc. of Professional Engineers v. United States*, 435 U.S. 679, 691 (1978); *Cnty. of Tuolumne v. Sonora*

-16-

*Cmty. Hosp.*, 236 F.3d 1148, 1158 (9th Cir. 2001)]. The rule of reason analysis assesses the economic effects of a particular practice and weighs those against any justifications for the practice. [*Palsson*, 16 Cal.3d at 934–935]. To make this determination, courts look to (1) the effects the anticompetitive conduct has on competitors or consumers; (2) whether the anticompetitive conduct limits entry into the market by potential or actual competitors; or (3) whether the anticompetitive conduct increased prices or reduced output in the relevant market. [See, *Id.* at 935-937; see also, *People v. Nat'l Assoc. of Realtors*, 120 Cal.App.3d 459, 482 (1981)]. An analysis of anticompetitive effects or whether there exists a "restraint on trade" requires that the restraint be shown to have anticompetitive effects in a relevant market. [*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal.3d 842, 854 (1971)].

Paragraph 63 of the FAC alleged that the relevant product market consists of "***all non-Mercedes franchise vehicle dealerships in California*** whose right to accept MBFS leased Mercedes vehicles as trade in vehicles and whose right to purchase MBFS leased Mercedes vehicles has…or will in the future…be infringed upon and violated, and who have or will suffer damage, as a result of Defendants' unfair, unlawful, and anticompetitive conduct[.]" [Dkt. # 20 at ¶ 63 (emphasis added)]. A plaintiff may plead market power through allegations of "(1) direct evidence ***showing the effects of anticompetitive behavior***, or (2) indirect evidence of market power." [*PNY Techs., Inc. v. SanDisk Corp.*, 2012 U.S.Dist.LEXIS 55965, at *21 (N.D.Cal. 2012) (emphasis added)]. To demonstrate direct market power, a plaintiff must allege facts which directly links the anticompetitive conduct to increased prices, reduced output, decreased quality, or barriers to new or continued business within the market. [*See, MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 182-183 (2d Cir. 2016)].

In the FAC, Plaintiff alleged facts related to Defendants' direct market power which demonstrates that the resulting effect of MBUSA's anticompetitive conduct was an increase in prices and a decrease in output. With respect to decreased output,

1   Plaintiff alleged that as a result of MBUSA's unlawful refusal to allow consumers to

2   trade in their leased vehicles to non-Mercedes franchise dealerships, "there is a

3   reduced number of used Mercedes vehicles available on the market for purchase by

4   non-Mercedes franchise dealers for resale." [Dkt. # 20 at ¶ 74]. With respect to

5   increased prices, Plaintiff alleged that by "cornering the market for previously leased

6   MBFS Mercedes vehicles, [current] and future competition between Defendants,

7   Plaintiff, and those similarly situated will be eliminated…and prices for Mercedes'

8   used vehicles will rise to levels they would never have risen in the absence of

9   Defendants' monopolistic and anticompetitive conduct." [*Id*. at ¶ 54]. Plaintiff

10  further alleged MBUSA's conduct created "barriers to commerce or entrance into the

11  market" which would never have existed "in the absence of

12  Defendants'…anticompetitive conduct[.]" [*Id*. at ¶ 70, 73].

13      By virtue of alleging the effects of Defendants' anticompetitive behavior,

14  Plaintiff has properly alleged evidence of "direct market power"

15      **(C) MBUSA'S ARGUMENT RELATED TO PROHIBITIONS ON ASSIGNMENT IS**

16      **IRRELEVANT BECAUSE THERE WAS NEVER AN ASSIGNMENT OF RIGHTS**

17      According to MBUSA, its lease provisions "reflect the fact that the lessee has

18  a nonassignable right to purchase his or her leased vehicle at any time, but that this

19  right is not transferable to others, including third-party dealers like Plaintiff, without

20  the lessor's permission." [Dkt. # 23 at 12]. In short, MBUSA's contention related to

21  "prohibitions on assignment" would be relevant if Plaintiff alleged that MBUSA's

22  has interfered with the lease's assignment. However, Plaintiff never alleged that

23  consumers "assigned" their purchase option, and rightfully so, as it is not an

24  assignment, but a power of attorney, which allows dealers to purchase leased

25  vehicles as trade-ins. [See, DMV Form REG 262, § 5].

26      "An assignment purports to transfer ownership…to the assignee, giving it

27  standing to assert those rights…on its own behalf…A power of attorney, on the other

28  hand, does not transfer an ownership interest…but simply confers on the agent the

-18-

1 authority to act on behalf of the principal[.]" [*Am. Orthopedic & Sports Med. v.*

2 *Indep. Blue Cross Blue Shield*, 890 F.3d 445, 454-55 (3d Cir. 2018) (citations

3 omitted)]. So long as a consumer retains ownership in the vehicle, they may, as the

4 principal, "confer on [their] agent the authority" to invoke the purchase option on the

5 consumer's behalf, "and the anti-assignment clause no more has power to strip

6 [Plaintiff] to act as [the lessee's] agent than it does to strip [the lessee] of [their] own

7 ability to [purchase the vehicle]." [*Ibid.*]

8     Because the process by which Plaintiff purchases leased Mercedes vehicles is

9 not through an "assignment," MBUSA's argument related to prohibitions on

10 assignment should be given no regard.

11     **(D)  PLAINTIFF PROPERLY ALLEGED A CLAIM UNDER THE UNFAIR AND**

12         **UNLAWFUL PRONGS OF THE UCL**

13     California's Unfair Competition Law ("UCL") prohibits "unfair competition,"

14 which it defines as "any unlawful, unfair or fraudulent business act or practice."

15 [Bus. & Prof. Code § 17200]. Because the UCL is written in the disjunctive, it

16 establishes three varieties of unfair competition—acts or practices which are

17 unlawful, or unfair, or fraudulent. [*Cel-Tech Communications, Inc. v. Los Angeles*

18 *Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999)].

19     ***(1)  The "Unlawful" Prong is Satisfied by the Allegations of MBUSA's***

20         ***Anticompetitive Conduct***

21     A business act or practice is "unlawful" when the act or practice is forbidden

22 by law. [See, *Farmers Ins. Exch. v. Superior Court*, 2 Cal.4th 377, 383 (1992)]. Any

23 business act or practice that is unlawful, in the sense that it violates a specific statute,

24 may be enjoined under the UCL. [See, *Comm. on Children's Television, Inc. v. Gen.*

25 *Foods Corp.*, 35 Cal.3d 197, 209–210 (1983); see also, *Consumers Union of United*

26 *States, Inc. v. Fisher Dev., Inc.,* 208 Cal.App.3d 1433, 1438–1439 (1989)]. In other

27 words, virtually any law—civil, criminal, federal, state, municipal, statutory,

28 regulatory, or court-made—can serve as the predicate for an unfair competition

1  action. [*See, e.g., Californians for Population Stabilization v. Hewlett-Packard Co.*,

2  58 Cal.App.4th 273, 287 (1997) (explaining that courts have used anti-discrimination

3  laws, antitrust laws, criminal laws, environmental protection laws, fish and game

4  laws, housing laws, labor laws, and vehicle laws to find that a particular business

5  practice was "unlawful" under the UCL).].

6       In short, activities which constitute a combination in restraint of trade are not

7  only unlawful under the Cartwright Act, but also under common law. [*See, e.g.,*

8  *Speegle*, 29 Cal.2d at 44 ("under the common law of this state[,] combinations

9  entered into for the purpose of restraining competition and fixing prices are

10  unlawful.")]. Given the well-settled judicial principle which encourages the use of

11  court-made or "common laws" as the basis for finding a business practice to be

12  "unlawful" under the UCL, Plaintiff need not even survive dismissal of the

13  Cartwright claim—for the mere failure to plead a claim under Cartwright does not

14  translate into a failure to plead a claim under the UCL based on the same set of facts.

15  More fundamentally, and as explained in §§ IV(B) and (C), *supra*, Plaintiff did, in

16  fact, properly state a claim for relief under Cartwright.

17       *(2)  Under Any Form of Recognized Legal Analysis, MBUSA's Alleged*

18           *Conduct Was Categorically "Unfair"*

19       The California Supreme Court has held that because § 17200 is written in the

20  disjunctive, an act or practice may be independently actionable as "unfair," even if

21  the act or practice is "not specifically proscribed by some other law." [*Cel-Tech,* 20

22  Cal.4th at 180]. The standard for determining whether conduct is unfair is

23  "intentionally broad, thus allowing courts maximum discretion to prohibit new

24  schemes to defraud." [*State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal.App.4th

25  1093, 1103 (1996) (citing *Motors, Inc. v. Times Mirror Co.*, 102 Cal.App.3d 735,

26  740 (1980)).]. Indeed, the very purpose of the UCL was to "enable judicial tribunals

27  to deal with the innumerable 'new schemes which the fertility of man's invention

28  would contrive.'" [*Barquis v. Merchs. Collection Ass'n of Oakland, Inc.*, 7 Cal.3d

94, 112 (1972) (citations omitted)].

Generally speaking, an unfair business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [*Candelore v. Tinder, Inc.*, 19 Cal.App.5th 1138, 1155 (2018) (citations omitted)]. The California Supreme Court has not established a definitive test to determine whether a business practice is unfair. (*See, e.g., Nationwide Biweekly Admin., Inc. v. Superior Court*, 9 Cal.5th 279, 304 (2020)  [acknowledging that "a split of authority has developed in the Courts of Appeal with regard to the proper test for determining whether a business practice is unfair under the UCL in consumer cases"].) In the absence of any definitive test, three separate tests have evolved. Under any of these tests, MBUSA's alleged conduct, when presumed true, is categorically "unfair."

### (a)  MBUSA's Conduct is Unfair Under the "Balancing Test"

One line of appellate decisions has held that claims under the UCL's "unfair" prong must be subjected to a "balancing test." Under this test, the court determines whether a business practice is unfair based on "an examination of [the practice's] impact on its alleged victim, balanced against the reasons, justifications[,] and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." [*Smith v. State Farm Mutual Automobile Ins. Co*., 93 Cal.App.4th 700, 718 (2001)].

Defendants' business practice of denying consumers the ability to trade-in their leased vehicles with anyone other than Defendants and their franchise dealers not only negatively impacts consumers at large, but even more significantly impacts non-Mercedes dealers such as Plaintiff. It is a consumer's legal right under California law to provide power-of-attorney to a vehicle dealership in order to pay off the vehicle. As discussed above, the California DMV has even created a form for such situations. [See, DMV Form REG-262]. The negative impact of Defendants' actions not only affects consumers and non-Mercedes dealerships, such as Plaintiff, but

1   actually extends to causing what will invariably be a significant reduction of used

2   Mercedes vehicles for sale by anyone other than Mercedes franchise dealerships.

3       This conduct is purely motivated by greed because the end result is that the

4   consumer and non-Mercedes dealers are cut out of the loop while Defendants and

5   their franchisees are able to capture as much profit as possible on the vehicle while

6   simultaneously being able to designate the vehicle as "Certified Pre-Owned"—which

7   thereby allows Defendants to charge even more money during the eventual resale of

8   the vehicle. [Dkt. #20 at ¶¶ 52-53]. Furthermore, MBUSA has not and cannot

9   provide sufficient justification for its conduct. For years, Defendants have never

10  raised an issue with third party payoffs, but as soon as the market for durable goods

11  becomes constrained, Defendants' first responsive action is to engage in

12  anticompetitive conduct.

13      On a balance, the utility of MBUSA's anticompetitive conduct does not

14  outweigh the gravity of harm to consumers; to Plaintiff and those similarly situated;

15  or to the State of California. Consequently, MBUSA's conduct is "unfair."

16      **(b)  MBUSA's Conduct is Considered Unfair Under the "Tethering Test"**

17      A second line of decisions has adopted what has been termed the "tethering

18  test," requiring that the public policy which is a predicate to the unfair competition

19  action must be 'tethered' to specific constitutional, statutory or regulatory provisions.

20  [See, *Cel-Tech*, 20 Cal.4th at 186-187].

21      As previously stated, a business practice is unfair when it "offends an

22  established public policy or when the practice is immoral, unethical, oppressive,

23  unscrupulous or substantially injurious to consumers." [*Candelore*, 19 Cal.App.5th at

24  1155]. In this case, by refusing to give effect to a power-of-attorney which allows

25  non-Mercedes dealerships to step into the shoes of the lessee and pay off the

26  remainder of the vehicle, Defendants were engaged in "unfair" conduct. More

27  specifically, when a consumer is statutorily entitled to purchase a vehicle, it is

28  "unscrupulous" and "substantially injurious to consumers" to interfere with their

-22-

1   legal right to trade-in their vehicle merely because the entity with whom the lessee

2   chooses to do business is not a Mercedes dealership. Not only is this practice unfair,

3   but it is also "tethered" to Bus. & Prof. Code § 16720 in that under this statute,

4   Defendants are prohibited from engaging in conduct which (1) restrains trade; (2)

5   prevents competition in the sale or purchase of merchandise; or (3) demonstrates an

6   agreement to unite interests such that the result is that the merchandise's price has

7   been affected. [Bus. & Prof. Code § 16720(a), (c), (e)]

8       Notwithstanding its statutory duty, and without needing to repeat what has

9   already been discussed *ad nauseum*, Defendants engaged in conduct which was

10  violative of all of the foregoing provisions of § 16720. For this reason, Defendants'

11  "unfair" conduct is tethered to a specific statutory provision.

12      **(c)   MBUSA's Conduct is Considered Unfair Under the "Section 5" Test**

13      A third line of cases has adopted the three-part definition of unfairness,

14  namely that: "(1) The consumer injury must be substantial; (2) the injury must not be

15  outweighed by any countervailing benefits to consumers or competition; and (3) it

16  must be an injury that consumers themselves could not reasonably have avoided."

17  [*Camacho v. Automobile Club of Southern California*, 142 Cal.App.4th 1394, 1403

18  (2006); see also, *Rubenstein v. The Gap, Inc.*, 14 Cal.App.5th 870, 880 (2017)]. This

19  test has sometimes been termed the "Section 5 Test."

20      ***First***, Plaintiff and thousands of other California non-Mercedes dealerships

21  who previously earned significant business through the process of "third party

22  payoffs," have unnecessarily been blocked from engaging in the sale or purchase of

23  previously leased Mercedes vehicles. In the aggregate, there can be no question that

24  the injury to Plaintiff and the putative class is substantial.

25      ***Second***, there are no countervailing benefits when Plaintiff and others have

26  been entirely blocked from a market which once made up a large portion of their

27  revenue. There are no countervailing benefits when, in the near future, the only place

28  consumers will be able to find a previously leased Mercedes vehicle is from a

Mercedes dealerships, nowhere else.

*Third*, the injury could not have been avoided because it is not the Plaintiff who chose to institute this anticompetitive, illegal policy. Rather, it was Defendants who chose to engage in this activity, and in the absence of this anticompetitive activity, Plaintiff would never have suffered injury.

For the foregoing reasons, MBUSA's conduct is also actionable under the "unfair" prong of the UCL.

**V.    CONCLUSION**

For the foregoing reasons, MBUSA's Motion to Dismiss should be denied. To the extent the Court finds any Plaintiff's claims were improperly pleaded, Plaintiff respectfully requests leave to amend in order to more particularly point out the basis for the relief being sought.

Date: April 5, 2022                    **LAW OFFICE OF ROBERT L. STARR**

                                       /s/ Theodore R. Tang.
                                       Theodore R. Tang
                                       Attorney for Plaintiff
                                       Calabasas Luxury Motorcars

OPPOSITION TO MERCEDES-BENZ USA'S MOTION TO DISMISS