Robert L. Starr (183052)
robert@starrlaw.com
Adam M. Rose (210880)
adam@starrlaw.com
Theodore R. Tang, Esq. (313294)
theodore@starrlaw.com
THE LAW OFFICE OF ROBERT L. STARR, APC
23901 Calabasas Road, STE #2072
Calabasas, CA 91302
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Attorneys for Plaintiff
Calabasas Luxury Motorcars

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALABASAS LUXURY MOTORCARS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MERCEDES-BENZ USA, LLC; MERCEDES-BENZ FINANCIAL SERVICES USA, LLC; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: 2:21-cv-08805-FMO-AS <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT MERCEDES-BENZ FINANCIAL SERVICES' MOTION TO DISMISS** |

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................ 3-9

**I.    INTRODUCTION** ........................................................ 10

**II.   RELEVANT FACTUAL ALLEGATIONS** ............................ 10

**III. LEGAL STANDARD** .................................................. 14

**IV.  ARGUMENT** ............................................................ 15

**(A) THE INTRA-CORPORATE IMMUNITY DOCTRINE IS INAPPLICABLE TO CONSPIRACIES WHICH DO NOT INVOLVE THE PARENT CORPORATION** . 15

**(B)  PLAINTIFF'S CARTWRIGHT ALLEGATIONS ARE THE FURTHEST THING FROM CONCLUSORY** ............................................. 18

*(1) Plaintiff Sufficiently Alleged the Existence of an "Unlawful Agreement"* ......................................................... 19

*(2) Plaintiff Sufficiently Alleged an "Overt Act"* ....................... 20

**(C)  PLAINTIFF SUFFICIENTLY ALLEGED A HARMFUL RESTRAINT OF TRADE UNDER THE RULE OF REASON** ....................................... 22

*(1) MBFS Confuses Sherman Pleading Requirements with Cartwright Pleading Requirements* .......................................... 24

*(2) Even When Applying the Pleading Requirements of Sherman to Cartwright, Plaintiff Has Still Properly Stated a Claim* ............. 25

*(3) Because There Was Never an Assignment of Rights,. MBFS's Argument Related to Prohibitions on Assignment is Irrelevant* ......... 27

**(D)  PLAINTIFF PROPERLY ALLEGED A CLAIM UNDER THE UNFAIR AND UNLAWFUL PRONGS OF THE UCL** ..................................... 28

*(1) The "Unlawful" Prong is Satisfied by the Allegations of MBFS's Anticompetitive Conduct* ........................................ 28

*(2) Under Any Form of Recognized Legal Analaysis, MBFS's Alleged Conduct Was Categorically "Unfair"* ................................. 29

(a) MBFS'S Alleged Conduct is Unfair Under the Balancing Test .. 30

**(b)** **MBFS's Alleged Conduct is Considered Unfair Under the Tethering Test**.................................................................................. 31

**(c)** **MBFS's Conduct is Considered Unfair Under the "Section 5" Test** ................................................................................................. 32

**(E)** **PLAINTIFF'S CLASS DEFINITION IS NOT "FAIL-SAFE"** ............................. 32

**V.** **CONCLUSION**.......................................................................................... 34

OPPOSITION TO MERCEDES-BENZ FINANCIAL SERVICES' MOTION TO DISMISS

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE**

*Alig v. Quicken Loans, Inc.*
　　2016 U.S.Dist.LEXIS 194382 (N.D. W.Va. 2016)..........................15

*Am. Needle, Inc. v. National Football League*
　　560 U.S. 183 (2010) .......................................................................17

*Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*
　　890 F.3d 445 (3d Cir. 2018).......................................................27-28

*Ashcroft v. Iqbal*
　　556 U.S. 662 (2009) .......................................................................15

*Bell Atlantic Corp. v. Twombly*
　　550 U.S. 544 (2007) ..................................................................14-15

*Bowerman v. Field Asset Servs., Inc.*
　　2015 U.S. Dist. LEXIS 37988 (N.D. Cal. Mar. 24, 2015) ..............33

*Briseno v. ConAgra Foods, Inc.*
　　844 F.3d 1121 (9th Cir. 2017)........................................................33

*Bryson v. Gonzales*
　　534 F.3d 1282 (10th Cir. 2008).....................................................15

*Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters*
　　497 F.3d 972 (9th Cir. 2007).........................................................14

*Clean Conversion Techs., Inc. v. Cleantech Biofuels, Inc.*
　　2012 U.S. Dist. LEXIS 117279 (S.D. Cal. 2012) ......................26-27

*Cont'l T.V., Inc. v GTE Sylvania Inc.*
　　433 U.S. 36 (1977) .........................................................................23

*Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*
　　911 F.2d 242 (9th Cir. 1990).........................................................15

*Copperweld Corp. v. Independence Tube Corp.*
　　467 U.S. 752 (1984) .......................................................................15

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*
   236 F.3d 1148 (9th Cir. 2001) ................................................................. 23

*Daimler AG v. Bauman*
   571 U.S. 117 (2014) ............................................................................... 17

*Dole Food Co. v. Patrickson*
   538 U.S. 468 (2003) ...................................................................... 16-17, 18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*
   504 U.S. 451 (1992) ............................................................................... 26

*FTC v. Indiana Fed'n of Dentists*
   476 U.S. 447 (1986) ............................................................................... 23

*Haghayeghi v. Guess?, Inc.*
   2015 U.S.Dist.LEXIS 43243 (S.D.Cal. 2015) ................................................. 34

*Kamar v. RadioShack Corp.*
   375 Fed. Appx. 734 (9th Cir. 2010) ......................................................... 32-33

*MacDermid Printing Solutions LLC v. Cortron Corp.*
   833 F.3d 172 (2d Cir. 2016) .................................................................... 26

*Makaron v. Enagic USA, Inc.*
   324 F.R.D. 228 (C.D. Cal. 2018) ............................................................... 33

*McHenry v. J P Chase Morgan Bank NA*
   2021 U.S.Dist.LEXIS 14857 (W.D. La. 2021) ................................................ 16

*Moss v. U.S. Secret Service*
   572 F.3d 962 (9th Cir. 2009) ................................................................... 15

*Nat'l Soc. of Professional Engineers v. United States*
   435 U.S. 679 (1978) ............................................................................... 23

*NCAA v. Board of Regents*
   468 U.S. 85 (1984) ................................................................................. 23

*Newcal Indus. v. Ikon Office Solution*
   513 F.3d 1038 (9th Cir. 2008) ............................................................. 24, 26

*Newport Components, Inc. v. NEC Home Electronics, Inc.*
  671. F.Supp 1525 (C.D. Cal. 1987) ................................................................. 16

*Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*
  472 U.S. 284 (1985) ......................................................................................... 22

*Olney v. Job.Com, Inc.*
  2013 U.S.Dist.LEXIS 141339 (E.D.Cal. Sep. 30, 2013) ................................. 33

*PNY Techs., Inc. v. SanDisk Corp.*
  2012 U.S.Dist.LEXIS 55965 (N.D.Cal. 2012) ................................................ 26

*Powers v. Hamilton Cnty. Pub. Defender Com'n,*
  501 F.3d 592 (6th Cir. 2007) ......................................................................... 34

*In re Ray Dobbins Lincoln-Mercury v. Ford Motor Co.*
  604 F.Supp. 203 (W.D. Va. 1984) ............................................................. 15-16

*Rebel Oil Co. v. Atl. Richfield Co.*
  51 F.3d 1421 (9th Cir. 1995) .......................................................................... 26

*Ronconi v. Larkin*
  253 F.3d 423 (9th Cir. 2001) .......................................................................... 14

*Samsung Elec's Co. v. Panasonic Corp.*
  747 F.3d 1199 (9th Cir. 2014) ........................................................................ 25

*Sauter v. CVS Pharm., Inc.*
  2014 U.S.Dist.LEXIS 63122 (S.D.Ohio 2014) ............................................... 34

*Walker v. Life Ins. Co of the SW*
  953 F.3d 624 (9th Cir. 2020) .......................................................................... 33

*Texaco Inc. v. Dagher*
  547 U.S. 1 (2006) ........................................................................................... 22

**STATE CASES**

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*
  7 Cal.4th 503 (1994) ....................................................................................... 19

OPPOSITION TO MERCEDES-BENZ FINANCIAL SERVICES' MOTION TO DISMISS

*Barquis v. Merchs. Collection Ass'n of Oakland, Inc.*
   7 Cal.3d 94 (1972)................................................................................ 29

*Black v. Sullivan*
   48 Cal.App.3d 557 (1975)................................................................... 19

*Californians for Population Stabilization v. Hewlett-Packard Co.*
   58 Cal.App.4th 273 (1997)...........................................................28-29

*Camacho v. Automobile Club of Southern California*
   142 Cal.App.4th 1394 (2006).............................................................. 32

*Candelore v. Tinder, Inc.*
   19 Cal.App.5th 1138 (2018)............................................................... 30

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*
   20 Cal.4th 163 (1999) ......................................................... 28, 29, 31

*Chavez v. Whirlpool Corp.*
   93 Cal.App.4th 363 (2001)................................................................. 19

*Cianci v. Superior Court*
   40 Cal.3d 903 (1985)......................................................................... 24

*In re Cipro Cases I & II*
   61 Cal.4th 116 (2015)........................................................................ 25

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*
   35 Cal.3d 197 (1983)......................................................................... 28

*Consumers Union of United States, Inc. v. Fisher Dev., Inc.*
   208 Cal.App.3d 1433 (1989).............................................................. 28

*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*
   4 Cal.3d 842 (1971)........................................................................... 24

*Exxon Corp. v. Superior Court*
   51 Cal.App.4th 1672 (1997)............................................................... 23

*Farmers Ins. Exch. v. Superior Court*
   2 Cal.4th 377 (1992).......................................................................... 28

*Freeman v. San Diego Ass'n of Realtors*
    77 Cal.App.4th 171 (1999)................................................................ 21

*Loeb v. Kimmerle*
    215 Cal. 143 (1932)........................................................................ 19

*Macmanus v. A. E. Realty Partners*
    146 Cal.App.3d 275 (1983).............................................................. 17

*Marin County Bd. of Realtors, Inc. v. Palsson*
    16 Cal.3d 920 (1976)..................................................................22-23

*Motors, Inc. v. Times Mirror Co.*
    102 Cal.App.3d 735, 740 (1980) ..................................................... 29

*Mox Inc. v. Woods*
    202 Cal. 675 (1927)........................................................................ 19

*Nationwide Biweekly Admin., Inc. v. Superior Court*
    9 Cal.5th 279 (2020)...................................................................... 30

*Navarrete v. Meyer*
    237 Cal.App.4th 1276 (2015)........................................................... 19

*People v. Nat'l Assoc. of Realtors*
    120 Cal.App.3d 459 (1981)..........................................................23-24

*Quelimane Co. v. Stewart Title Guaranty Co.*
    19 Cal.4th 26 (1998)................................................................. 21, 24

*Rubenstein v. The Gap, Inc.*
    14 Cal.App.5th 870 (2017).............................................................. 32

*Semole v. Sansoucie*
    28 Cal.App.3d 714 (1972)............................................................... 22

*Smith v. State Farm Mutual Automobile Ins. Co.*
    93 Cal.App.4th 700 (2001) ............................................................. 30

*Speegle v. Board of Fire Underwriters*
    29 Cal.2d 34 (1946)................................................................. 19, 29

*State Farm Fire & Cas. Co. v. Superior Court*
   45 Cal.App.4th 1093 (1996) ............................................................................ 29

*Unruh v. Truck Ins. Exch.*
   7 Cal.3d 616 (1972) ....................................................................................... 21

*Wyatt v. Union Mortgage Co.*
   24 Cal.3d 773 (1979) ..................................................................................... 19

## **STATUTES**

15 U.S.C. § 1 ...................................................................................................... 22

Cal. Bus. & Prof. Code § 16720 ................................................................. 19, 20, 32

Cal. Bus. & Prof. Code § 17200 ....................................................................*passim*

Cal. Civil Code § 2987 ........................................................................................ 10

Cal. Vehicle Code § 11709.4 ........................................................................... 10, 11

OPPOSITION TO MERCEDES-BENZ FINANCIAL SERVICES' MOTION TO DISMISS

## I.     INTRODUCTION

This is a case about how, through anticompetitive and monopolistic conduct, Defendants Mercedes-Benz USA ("MBUSA") and Mercedes-Benz Financial Services ("MBFS") (collectively "Defendants") have inflicted severe economic harm to non-Mercedes vehicle dealerships throughout the State of California. Plaintiff is one of those dealerships. Plaintiff filed suit against Defendants and then filed a First Amended Complaint ("FAC") alleging causes of action for violation of the Cartwright Act and California's Unfair Competition Law. In response, MBFS has moved to dismiss. For the reasons explained below, the motion should be denied.

## II.    RELEVANT FACTUAL ALLEGATIONS

Plaintiff's First Amended Complaint ("FAC") alleged that due to the recent catapulting of prices for new and used cars, lessees whose lease terms have either not yet expired or are about to expire have found themselves in possession of vehicles whose market values—as calculated by California Civil Code § 2987—are worth significantly more than the amounts owed on their respective leases. [Dkt. # 20 at ¶¶ 25-26]. Due to this increased equity, consumers are recognizing that the resale value of their vehicles exceeds the vehicle's payoff price, and many consumers have thus sought to buy out the lease and sell/trade-in the car for a profit rather than turning the car over to MBFS at the end of the lease. [*Id*. at ¶ 27]. According to the FAC, "[a] consumer's ability to trade in their Mercedes vehicle to a non-Mercedes franchise dealer is…necessary…in order to ensure a robust competitive market for consumers who wish to sell their vehicles as well as…***for non-Mercedes dealers*** who wish to purchase and sell Mercedes vehicles[,] and consumers who wish to purchase used Mercedes vehicles." [*Id*. at ¶ 33 (emphasis added)].

Pursuant to Cal. Civ. Code § 2987, consumers have a statutory right to terminate their lease early in connection with the purchase or lease of another vehicle. Cal. Vehicle Code § 11709.4 sets forth the procedures which must be employed by a licensed vehicle dealer when a consumer wishes to exercise its right

-10-

1    to trade-in the vehicle pursuant to Civ. Code § 2987. The FAC alleges that pursuant

2    to both of these statutes, there must necessarily exist an implied statutory right in

3    favor of licensed vehicle dealers to accept vehicle trade-ins, for if such were not the

4    case, then there would be no need for these statutes in the first place. That is to say, if

5    a licensed vehicle dealer did not have the right to accept trade-ins or engage in

6    "third-party payoffs," then both Civ. Code § 2987 and Vehicle Code § 11709.4

7    would be rendered completely nugatory. [Dkt. # 20 at ¶¶ 36-38, 41].

8        Against the backdrop of a licensed vehicle dealer's statutory right to engage in

9    third-party payoffs, the FAC alleges that as a result of a shortage in the supply of

10   durable goods, Defendants have sought to place an unfair restraint on trade "by

11   intentionally impeding and frustrating the ability of non-Mercedes franchise

12   dealerships to accept MBFS leased Mercedes vehicles as trade in vehicles[,] while

13   simultaneously [and] intentionally impeding…the ability of consumers to sell their

14   MBFS leased Mercedes vehicles to non-Mercedes franchise dealerships." [*Id*. at ¶

15   42]. For example, if a consumer whose lease is about to expire decides to trade in

16   their leased Mercedes vehicle for a non-Mercedes brand vehicle, the non-Mercedes

17   franchise dealer "is impeded and frustrated in its ability to accept the vehicle because

18   MBFS intentionally impedes and frustrates the ability of the non-Mercedes franchise

19   dealerships from purchasing MBFS leased Mercedes vehicles as trade in vehicles."

20   And the same holds true when "the consumer attempts to trade in the vehicle or sell

21   the MBFS leased Mercedes vehicle to an independent used vehicle dealership." [*Id*.

22   at ¶ 43]

23       Plaintiff alleges that MBFS's intentional anti-competitive conduct is designed

24   to force MBFS customers to return their leased Mercedes only to Mercedes franchise

25   dealerships and no one else. Therefore, if a consumer has leased a Mercedes vehicle

26   and wants to end the lease early, they are now prevented from engaging in commerce

27   with any non-Mercedes franchise dealerships and are instead relegated to dealing

28   strictly with Mercedes franchise dealerships. [*Id*. at ¶ 44]. By taking numerous steps

1  to keep leased vehicles on the "Mercedes Merry-go-Round," Defendants have

2  prevented non-Mercedes dealerships, such as Plaintiff, from exercising their right to

3  purchase these leased vehicles as "trade-ins." [*Id*. ¶ 46]. Defendants accomplish this

4  anticompetitive conduct by unlawfully refusing to allow consumers to trade in their

5  leased vehicles to non-Mercedes franchise dealerships. [*Ibid*.].

6      In short, Defendants have colluded with each other and have tacitly or

7  explicitly agreed to engage in this anticompetitive conduct for their own benefit by

8  (1) ensuring to the greatest degree possible that only Mercedes dealership have

9  access to MBFS-leased Mercedes vehicles after they are traded in or sold at the end

10 of the lease term; and (2) ensuring Defendants, as well as Mercedes franchises,

11 capture as much profit as possible by being able to designate the vehicles as

12 "Certified Pre-Owned," which thereby allows Defendants to charge even more

13 money during the invariable resale of the vehicle. [*Id*. at ¶¶ 52, 53].

14     Having alleged facts which, when taken as true, plausibly establish that

15 Defendants' conduct is "in restraint of trade," Plaintiff further alleges that if

16 "Defendants are allowed to continue to stifle the sale of used Mercedes vehicles at

17 non-Mercedes franchise dealerships…California residents will, for the most part,

18 only be able to purchase a previously-leased Mercedes vehicle from a Mercedes

19 franchise dealership. [*Id*. at ¶ 54]. By engaging in these anticompetitive practices,

20 "Defendants are seizing major control over the market of [used] Mercedes

21 vehicles…because a large percentage of new Mercedes vehicles that are acquired by

22 consumers in California are acquired through lease rather than purchase." [*Ibid*.].

23     Given the volume of previously-leased Mercedes vehicles which are bought,

24 sold, and traded-in on annual basis in this State, Plaintiff alleges that the relevant

25 market which is most negatively impacted by Defendants' anticompetitive conduct

26 consists of "all non-Mercedes franchise vehicle dealerships in California whose right

27 to accept MBFS leased Mercedes vehicles as trade in vehicles and whose right to

28 purchase MBFS leased Mercedes vehicles has…or will in the future…be infringed

-12-

1  upon and violated, and who have or will suffer damage, as a result of Defendants'

2  unfair, unlawful, and anticompetitive conduct[.]" [*Id*. at ¶ 63].

3        As a result of the brazen manner in which Defendants have cornered the

4  California market for used Mercedes vehicles, Plaintiff alleges that market

5  competition between Defendants and Plaintiff will be substantially eliminated or

6  substantially reduced, and prices for used Mercedes vehicles will rise to levels they

7  would never have risen in the absence of Defendants' monopolistic and

8  anticompetitive conduct. Moreover, consumers who wish to sell their leased

9  Mercedes vehicles will have reduced options; will enjoy less competition for the

10 purchase of their vehicles; and will thus receive less money when selling or trading

11 in their leased vehicles. [*Id*. at ¶ 55].

12       With respect to the damage suffered, Plaintiff alleges that as a result of "the

13 contract, combination, or conspiracy…among Defendants…to fix, raise, maintain,

14 and stabilize the prices of, and allocate the market for and restrain trade relating to

15 used Mercedes vehicles…Plaintiff and those similarly situated would never have

16 faced these barriers to commerce or entrance into the market in the absence of

17 Defendants'…anticompetitive conduct[.]" [*Id*. at ¶ 70, 73]. That is to say, the end

18 result of Defendants' anticompetitive conduct "is that there is a reduced number of

19 used Mercedes vehicles available on the market for purchase by non-Mercedes

20 franchise dealers for resale." [*Id*. at 74].

21       In addition to violation of the Cartwright Act, Plaintiff alleges that

22 Defendants' anticompetitive conduct is also violative of the "unfair" and "unlawful"

23 prongs of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200).

24 Defendants' conduct is "unfair" because in their attempt to restrain trade, they

25 intentionally impede and frustrate Plaintiff's ability to exercise its statutory right to

26 purchase a leased vehicle as a trade-in. [Dkt. # 20 at ¶ 85]. Despite the longstanding

27 existence of both a statutory right and industry custom in favor of allowing vehicle

28 dealers to purchase leased vehicles as "trade-ins," Defendants' newfound business

OPPOSITION TO MERCEDES-BENZ FINANCIAL SERVICES' MOTION TO DISMISS

1  practice violates established public policy and is substantially injurious to consumers

2  such as Plaintiff who are being prevented from exercising their statutory and

3  common law rights. [*Id*. at ¶ 86].

4      Importantly, a sizable portion of Plaintiff's business model revolves around

5  dealing with those vast majority of consumers who either lack the desire or liquidity

6  to pay off their leased vehicles and sell them on their own. But now, as a result of

7  Defendants' wrongful conduct, MBFS lessees who wish to terminate their lease early

8  or capture any of the equity in their lease are forced to do so at a Mercedes franchise

9  dealership alone. This not only unfairly prevents consumers from having free choice

10  but, most relevant here, it also "restrain[s] trade and unfairly prevents non-Mercedes

11  franchise dealerships from being able to purchase MBFS leased Mercedes vehicles."

12  [*Id*. at ¶ 86]. Plaintiff further alleges that Defendants' business practices are unfair

13  because their conduct is tethered to their interference with Plaintiff's statutory rights

14  pursuant to Vehicle Code § 11709.4 and Civil Code § 2987. [*Id*. at ¶ 88].

15      Finally, the FAC alleges that Defendants' conduct violates § 17200's

16  "unlawful" prong because Defendants' conduct "impos[es] unfair and unreasonable

17  restrictions on a non-Mercedes…dealer's right to accept the vehicle as a trade in.

18  Similarly, MBFS intentionally impedes and frustrates the ability of MBFS leased

19  Mercedes vehicles to be sold to non-Mercedes franchise dealers…at the end of the

20  lease [and] [t]he only actual reason that Defendants engage in such conduct is to gain

21  an unfair advantage in the marketplace." [*Id*. at ¶ 101].

22  **III.   LEGAL STANDARD**

23      The legal methodology for ruling on a motion to dismiss requires the court to

24  assume all well-pled facts to be true and to draw all reasonable inferences in favor of

25  the non-moving party. [See, *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters*,

26  497 F.3d 972, 975 (9th Cir. 2007)]. When reviewing the complaint, the Court must

27  not read each allegation in isolation, but instead must read it "as a whole" and its

28  parts in their context. [See, *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)]. A

1  complaint need only allege sufficient facts to show "a claim to relief that is plausible
2  on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)]. Assessing
3  plausibility does not involve analysis of the merits. [*Id*. at 556-57].

4       "A claim has facial plausibility when the plaintiff pleads factual content that
5  allows the court to draw the reasonable inference that the defendant is liable for the
6  misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]. "This is not to
7  say that the factual allegations must themselves be plausible; after all, they are
8  assumed to be true. It is just to say that relief must follow from the facts alleged."
9  [*Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008); see also, *Moss v. U.S.
10 Secret Service*, 572 F.3d 962, 970 (9th Cir. 2009) ("When there are well pleaded
11 factual allegations, a court should assume their veracity and then determine whether
12 they plausibly give rise to an entitlement to relief.")]. To the extent the pleadings fail
13 to state a claim, the court should grant leave to amend if these insufficiencies can be
14 cured by additional facts. [*Cook, Perkiss and Liehe, Inc. v. Northern California
15 Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted)].

16 **IV.   ARGUMENT**

17    **(A)   THE INTRA-CORPORATE IMMUNITY DOCTRINE IS INAPPLICABLE TO**
18         **CONSPIRACIES WHICH DO NOT INVOLVE THE PARENT CORPORATION**

19       According to MBFS "Calabasas does not and cannot allege a conspiracy
20 between MBFS and MBUSA in violation of the antitrust laws because the two share
21 a common corporate parent." [Dkt. #21-1 at 16]. Simply put, MBFS is laboring under
22 a misapprehension of the intra-corporate immunity doctrine.

23       It is well-settled that conspiracy claims against both a parent and child
24 corporation are prohibited under anti-trust law. [See, *Copperweld Corp. v.
25 Independence Tube Corp.*, 467 U.S. 752, 768-69 (1984)]. At the same time, "there is
26 no prohibition on claims for conspiracy between or among 'sister' or related
27 companies[.]" [*Alig v. Quicken Loans, Inc*. 2016 U.S.Dist.LEXIS 194382, at *70-71
28 (N.D. W.Va. 2016) (citing *In re Ray Dobbins Lincoln-Mercury v. Ford Motor Co.*,

-15-

604 F.Supp. 203, 205 (W.D. Va. 1984).)]. In the case of *Ray Dobbins*, the Court made crystal clear that *Copperweld* does not apply to allegations of conspiracy which only allege the involvement of two subsidiaries and not the parent. [See, *Ray Dobbins*, 604 F.Supp. at 205]. As a point of emphasis, *Ray Dobbins* was cited with approval by this very Court in *Newport Components, Inc. v. NEC Home Electronics, Inc.*, 671. F.Supp 1525 (C.D. Cal. 1987).

In *Newport Components*, this Court explained that had Newport alleged a conspiracy between two sister corporations, then its case would have been more akin to *Ray Dobbins*, and Newport's antitrust allegations would have survived dismissal. The Court clarified, however, that "[u]nlike the situation in *Ray Dobbins*, the parent corporation here, NEC, remains an 'alleged co-conspirator' in the case and, according to [Newport]'s complaint, actually directed the conspiracy in which its subsidiaries allegedly participated…Accordingly, the Court finds plaintiff's [reliance on *Ray Dobbins*] to be without merit." [*Newport Components*, 671 F.Supp. at 1544, fn. 25].

Identical to the circumstances in *Ray Dobbins*, and in contrast to the circumstances in *Newport Components*, the Plaintiff in this case has alleged a conspiracy between MBUSA and MBFS and has made absolutely no mention or reference to Defendants' parent corporation—Mercedes Benz Group (formerly Daimler AG). Notably, MBFS admits that Defendants are both "wholly owned *indirect subsidiaries* of Daimler AG." [Dkt. # 21-1 at 13 (emphasis added)]. Yet, "the words direct and indirect subsidiaries, given their plain meaning, would mean entities owned by [the parent] (direct subsidiaries) or owned by subsidiaries of [the parent] (indirect subsidiaries)." [*McHenry v. J P Chase Morgan Bank NA*, 2021 U.S.Dist.LEXIS 14857, at *9 (W.D. La. 2021)]. "A corporate parent [who] owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and it follows with even greater force [that] the parent does not own or have legal title to the subsidiaries of the subsidiary." [*Dole Food Co. v.

-16-

1  *Patrickson*, 538 U.S. 468, 475 (2003)].

2      The "single entity test" or "intraenterprise conspiracy test" is "easily satisfied

3  when corporate policies are set by one individual or by a parent corporation to the

4  extent there is no autonomy. At the other extreme, jointly owned corporations

5  that…set policy independently[] are capable of conspiring to restrain trade as distinct

6  entities." [*Macmanus v. A. E. Realty Partners*, 146 Cal.App.3d 275, 287 (1983)

7  (citations omitted)]. The key to the proper application of the intra-corporate

8  immunity doctrine is not whether the Defendants can technically be linked to one

9  single corporate entity, or that they claim to share a unity of interest. Instead, "[t]he

10  relevant inquiry…is whether there is a contract, combination or conspiracy amongst

11  separate economic actors pursuing separate economic interests, such that the

12  agreement deprives the marketplace of independent centers of decision making, and

13  therefore of diversity of entrepreneurial interests." [*Am. Needle, Inc. v. National*

14  *Football League*, 560 U.S. 183, 195 (2010)].

15      In reference to Defendants and their parent corporation, the Supreme Court has

16  explained that "[t]he relationship between Daimler and MBUSA is delineated in a

17  General Distributor Agreement, which sets forth requirements for MBUSA's

18  distribution of Mercedes-Benz vehicles in the United States. That agreement

19  establishe[s] MBUSA *as an independent contractor that buys and sells*

20  *vehicles…as an independent business for its own account*….[and] MBUSA has *no*

21  *authority* to make binding obligations for or act on behalf of DaimlerChrysler *or any*

22  DaimlerChrysler Group Company." [*Daimler AG v. Bauman* 571 U.S. 117, 123-124

23  (2014) (emphasis added)].

24      In light of the Supreme Court's direct reference to Daimler and Defendants as

25  separate and independent businesses with their "own account[s]," it strains credulity

26  for MBFS—which is a lending institution—to somehow contend that it is not a

27  separate economic actor from MBUSA—which is a vehicle manufacturer. Indeed,

28  upon engaging in even the most cursory review of Daimler's corporate structure, it

-17-

1  becomes readily apparent that not only are MBUSA and MBFS sister corporations,

2  but they are sister corporations which are twice removed from their connection to

3  Daimler. In other words, because Defendants are each owned by separate

4  subsidiaries of Daimler, it must follow "with even greater force" that the parent does

5  not hold control over the subsidiaries of the subsidiary. [*See, e.g., Dole*, 538 U.S. at

6  475]. More fundamentally, MBFS does not present any evidence which would

7  support that Daimler controlled any of its indirect subsidiaries, or that Daimler

8  exerted so much control over MBFS and MBUSA as indirect subsidiaries, that

9  MBFS and MBUSA should be viewed as being identical economic actors with

10  identical economic interests.

11        In sum, MBFS's reliance on *Copperweld* is misplaced. MBUSA and MBFS

12  are indirect sister subsidiaries engaged in separate areas of commerce. They are

13  separate economic actors that are fully capable of engaging in a conspiracy. The

14  FAC not only alleged a contract, combination, or conspiracy amongst these separate

15  economic actors, but further alleged that the "result of this illegal anticompetitive

16  activity is that there is a reduced number of used Mercedes vehicles available on the

17  market for purchase by non-Mercedes franchise dealers for resale" and that "[s]uch

18  conduct stifles competition, harms consumers, and harms the putative class." [Dkt. #

19  20 at ¶ 74]. For this initial reason, MBFS's motion should be denied.

20        **(B)  PLAINTIFF'S CARTWRIGHT ALLEGATIONS ARE THE FURTHEST THING**

21               **FROM CONCLUSORY**

22        Alternatively, MBFS argues that Plaintiff's Cartwright Act claim should be

23  dismissed because the allegations are "conclusory," and the FAC alleged no specific

24  facts "to show any agreement between the defendants and any other entity regarding

25  MBFS's lease trade-in policy." [Dkt. # 21-1 at 17]. According to MBFS, "[t]he

26  complaint alleges the ultimate fact of conspiracy, but it fails to plead the necessary

27  evidentiary facts to support those conclusions." [*Id*. at 18]. As demonstrated below,

28  MBFS either failed to read the FAC, or is flat out lying.

A Cartwright Act civil conspiracy claim must allege the formation and operation of a conspiracy. [*Chavez v. Whirlpool Corp.*, 93 Cal.App.4th 363, 373 (2001) (citations omitted)]. A civil conspiracy requires (1) an unlawful agreement; and (2) an overt act committed in furtherance of the conspiracy. [*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 511, 28 Cal. (1994)].

### *(1) Plaintiff Sufficiently Alleged the Existence of an "Unlawful Agreement"*

An "unlawful agreement" is a projected joint action where the defendants have united or cooperated with one another in inflicting a wrong on the plaintiff. [See, *Black v. Sullivan*, 48 Cal.App.3d 557, 566 (1975); *Mox Inc. v. Woods*, 202 Cal. 675, 677-678 (1927)]. All that is necessary is the defendant's knowing participation in a common plan or design to commit a civil wrong. [See, *Black*, 48 Cal.App.3d at 566-567; see also, *Loeb v. Kimmerle*, 215 Cal. 143, 150-151 (1932)]. Specific intent to harm a particular person or commit a specific injury is not required. [*Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1293 (2015)]. The agreement between conspirators need not be the result of an express agreement, but instead may rest upon tacit assent and acquiescence. [*Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 785-786 (1979)]. The agreement need not be proved by direct evidence, but may be shown by circumstantial evidence that tends to show a common intent.

To begin with, activities which constitute a combination in restraint of trade are not only unlawful under the Cartwright Act, but also under common law. [*Speegle v. Board of Fire Underwriters*, 29 Cal.2d 34, 44, 46 (1946)]. Acts considered to be "in restraint of trade" include creating restrictions in trade or commerce; preventing competition in the sale or purchase of merchandise; and agreeing to unite any interests connected with the sale of merchandise where the result is that "its price might in any manner be affected." [See, Cal. Bus. & Prof. Code § 16720].

In alleging the existence of an "unlawful agreement," Plaintiff averred that

MBUSA and MBFS "contracted, combined, and conspired by knowingly and intentionally impeding and frustrating the ability of non-Mercedes franchise dealers [from] accept[ing] MBFS leased Mercedes vehicles as trade in vehicles, and ***refusing to allow non-Mercedes franchise dealers to purchase MBFS-leased Mercedes vehicles from consumers***." [Dkt. # 20 at ¶ 71 (emphasis added)]. Plaintiff alleged that evidence of this unlawful agreement exists in written correspondence with a Mercedes-Benz Franchise dealership wherein a sales representative was quoted as acknowledging that "MB Dealers are the only ones allowed to payoff an MBFS lease…No 3rd party payoffs." [*Id*. at ¶ 45(e)].

Based on such evidence, Plaintiff alleges that the "contract, combination, or conspiracy consisted of and consists of a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators…to fix, raise, maintain, and stabilize the prices of, and allocate the market for and restrain trade relating to used Mercedes vehicles." [*Id*. at ¶ 70]. By "***cornering the market for previously leased Mercedes vehicles***…competition between Defendants, Plaintiff, and those similarly situated will be ***eliminated, or substantially reduced, and prices for Mercedes' used vehicles will rise*** to levels they would never have risen in the absence of Defendants' monopolistic and anticompetitive conduct." [*Id*. at ¶ 55 (emphasis added)].

When, as they must, the foregoing allegations are presumed true, they obviously establish the formation of a common plan or design to violate the Cartwright Act through conduct which (1) restrains trade; (2) prevents competition in the sale or purchase of merchandise; and (3) demonstrates an agreement to unite interests such that the result is that the merchandise's price has been affected. [Cal. Bus. & Prof. Code § 16720(a), (c), (e)]. Plaintiff has therefore properly alleged the existence of an "unlawful agreement" between MBFS and MBUSA.

### *(2) Plaintiff Sufficiently Alleged an Overt Act*

Plaintiff now turns to a discussion of the conspiracy's "overt wrongful act"

-20-

1  causing damage. It is well-settled that irrespective of whether a particular conspirator
2  was a direct actor and regardless of the degree of his or her activity, each participant
3  is responsible for the damage resulting from the acts committed in furtherance of the
4  conspiracy. [*Unruh v. Truck Ins. Exch.*, 7 Cal.3d 616, 631 (1972) (*superseded by*
5  *statute on other grounds*)]. The Complaint alleges that when consumers attempt to
6  trade in their leased Mercedes vehicle to Plaintiff, Defendants refuse and prohibit any
7  attempt by Plaintiff to accept these vehicles. Rather, Defendants will only allow
8  consumers to trade in their vehicles with a Mercedes franchise dealership—this
9  despite the fact that Plaintiff has a statutory right to purchase these vehicles without
10 interference from Defendants. [See, Dkt. # 20 at ¶ 57]. But by "corner[ing] the
11 prospective used vehicle market for MBFS-leased Mercedes vehicles" Defendants
12 have "intentionally imped[ed] and frustrat[ed] the ability of lessees to trade in their
13 vehicles to any dealership other than Mercedes franchise dealers." [*Id*. at ¶ 58]. The
14 foregoing conduct constitutes MBFS's "overt acts."

15      To be sure, a claim for violation of the Cartwright Act must be pled with
16 specificity. [*Freeman v. San Diego Ass'n of Realtors*, 77 Cal.App.4th 171, 196
17 (1999)]. In practice, however, the requirements for pleading a Cartwright claim have
18 been relatively flexible. For example, in *Quelimane Co. v. Stewart Title Guaranty*
19 *Co*., 19 Cal.4th 26 (1998), the California Supreme Court held that while plaintiffs
20 had to plead that the purpose of an agreement was to restrain trade, such purpose
21 could be inferred ***from the effect*** of the agreement. [*Id*. at 50]. Notably, although
22 *Quelimane* was a 17200 claim, the alleged Cartwright Act violation was what served
23 as the "unlawful conduct" undergirding the 17200 claim.

24      In the FAC, Plaintiff alleged that the effect of MBFS's "overt acts" or illegal
25 anticompetitive activity is that "there is a reduced number of used Mercedes vehicles
26 available on the market for purchase by non-Mercedes franchise dealers for resale"
27 and "Plaintiff and those similarly situated have been injured in their business and
28 property and have suffered damage due to Defendants' restraint of trade[.]" [*Id*. at ¶¶

72, 74]. This newly and artificially imposed prohibition being placed on Plaintiff's ability to buy and sell an entire brand of vehicles—a brand whose sale once constituted a mainstay of Plaintiff's business—constitutes severe economic injury under any form of reasonable analysis. And because this alleged injury is pled within the context of Plaintiff's other allegations related to MBFS's anticompetitive conduct [See, Dkt. # 20 at ¶¶ 40-58], Plaintiff has stated facts which allow for the plausible inference that it was MBFS's "overt unlawful acts" which caused Plaintiff damage. To the extent Defendants make the intellectually dishonest assertion that they remain confused, it is well-settled that it is the mechanisms of discovery which provide the most effective methods for obtaining factual details which might resolve any unanswered questions in the pleadings. [See, *Semole v. Sansoucie*, 28 Cal.App.3d 714, 719 (1972)].

In sum, Plaintiff explicitly alleged facts which, when taken as true, established the existence of an unlawful agreement and an overt act which resulted in damages. Plaintiff is thus having difficulty discerning why MBFS would argue that the FAC was "conclusory" and "alleged no specific facts," when the face of the FAC provably demonstrates otherwise. Accordingly, MBFS's Motion to Dismiss should be denied.

## (C) PLAINTIFF SUFFICIENTLY ALLEGED A HARMFUL RESTRAINT OF TRADE UNDER THE RULE OF REASON

Under federal law, Section 1 of the Sherman Antitrust Act prohibits "***every*** contract, combination…or conspiracy…in restraint of trade." [15 U.S.C. § 1 (emphasis added)]. In reality, courts have "not taken a literal approach to this language." [*Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)]. Instead, the Supreme Court has consistently limited the reach of Section 1 to "unreasonable" restraints of trade. [*See, e.g., Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985)]. Like its federal counterpart, the Cartwright Act does not prohibit all agreements which restrain trade, but only those agreements which "unreasonably" restrain trade. [*See, Marin County Bd. of Realtors, Inc. v. Palsson*, 16

1   Cal.3d 920, 930-931 (1976)].

2           The Supreme Court has defined unreasonable restraints on trade as those

3   which raise prices; reduce output; reduce quality; diminish consumer choice; or

4   enhance market power. [*NCAA v. Board of Regents*, 468 U.S. 85, 112-113 (1984);

5   *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986)]. To determine whether

6   a restraint is unreasonable, courts employ either a "*per se*" analysis, or a "rule of

7   reason" analysis. The *per se* analysis is reserved for those restraints which are so

8   clearly anticompetitive "as to render unjustified further examination of the

9   challenged conduct." [*NCAA*, 468 U.S. at 103-104 (1984); see also, *Cont'l T.V., Inc.*

10  *v GTE Sylvania Inc.*, 433 U.S. 36, 49-50 (1977)].

11          Under the Cartwright Act, there are only five practices which are considered to

12  be unlawful per se: (1) price fixing among competitors; (2) market division among

13  competitors; (3) group boycotts; (4) classic tying arrangements; and (5) vertical price

14  fixing. None of the foregoing practices are relevant to the instant case. Instead, the

15  allegations here involve a vertical restraint—which is subject to a rule of reason

16  analysis. [See, *Exxon Corp. v. Superior Court*, 51 Cal.App.4th 1672, 1680–1681

17  (1997)].

18          The "rule of reason" analysis requires review of the trade restraint's actual

19  effect on competition within a defined market. The ultimate determination that must

20  be made under a rule of reason analysis is simple to state—it is whether the

21  challenged activity promotes competition or suppresses it. [*Nat'l Soc. of Professional*

22  *Engineers v. United States*, 435 U.S. 679, 691 (1978); *Cnty. of Tuolumne v. Sonora*

23  *Cmty. Hosp.*, 236 F.3d 1148, 1158 (9th Cir. 2001)]. The rule of reason analysis

24  assesses the economic effects of a particular practice and weighs those against any

25  justifications for the practice. [*Palsson*, 16 Cal.3d at 934–935]. To make this

26  determination, courts look to (1) the effects the anticompetitive conduct has on

27  competitors or consumers; (2) whether the anticompetitive conduct limits entry into

28  the market by potential or actual competitors; or (3) whether the anticompetitive

1   conduct increased prices or reduced output in the relevant market. [See, *Id.* at 935-

2   937; see also, *People v. Nat'l Assoc. of Realtors*, 120 Cal.App.3d 459, 482 (1981)].

3       An analysis of anticompetitive effects or whether there exists a "restraint on

4   trade" requires that the restraint be shown to have anticompetitive effects in a

5   relevant market. [*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal.3d 842, 854

6   (1971)]. In its Motion to Dismiss, MBFS contends that Plaintiff's Cartwright claim

7   should be dismissed because the FAC's factual allegations fail to satisfy the "rule of

8   reason." For the reasons explained below, MBFS's argument is provably misguided.

9       **(1)  MBFS Confuses Sherman Pleading Requirements with Cartwright**

10          **Pleading Requirements**

11      MBFS argues that "[t]he complaint does not allege the existence of a single

12  product market in which MBFS's lease trade-in policy operates to restrain interbrand

13  competition" and further fails to "allege that [Defendants] exercise market power in

14  those broad markets[.]" [Dkt. # 21-1 at 22]. In short, MBFS is confusing the pleading

15  requirements for Cartwright Act claims with those for Sherman Act claims.

16      On the one hand, claims under the Sherman Act require the plaintiff to plead

17  facts which establish a "relevant market," and that the defendant holds power within

18  that market. [*Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir.

19  2008)]. On the other hand, Cartwright Act claims only require allegations of (1) the

20  formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant

21  thereto; (3) the damage resulting from such act or acts; and (4) facts which allow an

22  inference of intent to restrain trade. [*Quelimane*, 19 Cal.4th at 47-49]. The reason for

23  this distinction in pleading requirements is that Cartwright "***reaches beyond the***

24  ***Sherman Act*** to threats to competition in their incipiency—much like section 7 of

25  the Clayton Act, which prohibits mergers that 'may…substantially…lessen

26  competition, or…tend to create a monopoly'—and thereby goes beyond 'clear-cut

27  menaces to competition' in order to deal with merely 'ephemeral possibilities.'"

28  [*Cianci v. Superior Court*, 40 Cal.3d 903, 917-918 (1985) (emphasis added)

(citations omitted); see also, *Samsung Elec's Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014) (asserting that it "is no longer the law in California" to treat the Cartwright Act as "coextensive with the Sherman Act"); *In re Cipro Cases I & II*, 61 Cal.4th 116, 142 (2015) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act").].

Because the requirements for pleading a claim under Sherman are substantially different than those for pleading a claim under Cartwright, MBFS's argument is misguided. Moreover, Plaintiff's claims for relief are for violations of the Cartwright Act and Bus. & Prof. Code § 17200—both of which are California statutes. When drawing all reasonable inferences in favor of the nonmoving party, a court can clearly and unmistakably decipher that the relevant product market is confined to California alone.

### (2)   *Even When Applying the Pleading Requirements of Sherman to Cartwright, Plaintiff Has Still Properly Stated a Claim*

As briefly mentioned above, MBFS argues that "[t]he complaint does not allege the existence of a single product market in which MBFS's lease trade-in policy operates to restrain interbrand competition[.]" [Dkt. 21-1 at 22]. This is plainly untrue.

Paragraph 63 of the FAC alleged that the relevant product market consists of "***all non-Mercedes franchise vehicle dealerships in California*** whose right to accept MBFS leased Mercedes vehicles as trade in vehicles and whose right to purchase MBFS leased Mercedes vehicles has…or will in the future…be infringed upon and violated, and who have or will suffer damage, as a result of Defendants' unfair, unlawful, and anticompetitive conduct[.]" [Dkt. # 20 at ¶ 63 (emphasis added)]. Moreover, by alleging claims solely under California law, a court can fairly assume that the relevant product market is confined to non-Mercedes dealerships in California.

With respect to MBFS's contention that Plaintiff has failed to allege that

OPPOSITION TO MERCEDES-BENZ FINANCIAL SERVICES' MOTION TO DISMISS

Defendants exercise market power, market allegations do not need to be pled with specificity and will survive dismissal unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. [See, *Newcal*, 513 F.3d at 1045]. The validity of a defendant's power in the "relevant market" is typically a factual element rather than a legal element, and is thus a matter inappropriate for resolution at the motion to dismiss stage. [*Ibid*.].

Market power " has been defined as the ability of a single seller to raise price and restrict output[.]" [*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992)]. A plaintiff may plead market power through allegations of "(1) direct evidence *showing the effects of anticompetitive behavior*, or (2) indirect evidence of market power." [*PNY Techs., Inc. v. SanDisk Corp.*, 2012 U.S.Dist.LEXIS 55965, at *21 (N.D.Cal. 2012) (emphasis added)].

To demonstrate indirect market power, a plaintiff must define the relevant market and show that (1) the defendant has a dominant share of that market; and (2) that there are significant barriers to entry and existing competitors lack the capacity to increase their output in the short run. [*Ibid*. (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995).)].

To demonstrate direct market power, a plaintiff must allege facts which directly links the anticompetitive conduct to increased prices, reduced output, decreased quality, or barriers to new or continued business within the market. [*See, MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 182-183 (2d Cir. 2016); see also, *Rebel Oil*, 51 F.3d at 1439].

In the FAC, Plaintiff alleged facts related to Defendants' *direct market power* which demonstrates that the resulting effect of Defendants' anticompetitive conduct was an increase in prices and a decrease in output. Accordingly, Plaintiff need not make the required showings associated with indirect market power. [*See, e.g., Clean Conversion Techs., Inc. v. Cleantech Biofuels, Inc.*, 2012 U.S. Dist. LEXIS 117279, at *14 (S.D. Cal. 2012) ("A plaintiff may plead market power through allegations of

OPPOSITION TO MERCEDES-BENZ FINANCIAL SERVICES' MOTION TO DISMISS

1  direct evidence showing the effects of anticompetitive behavior, ***or*** indirect evidence

2  of market power.") (emphasis added)].

3      With respect to decreased output, Plaintiff alleged that as a result of MBFS's

4  unlawful refusal to allow consumers to trade in their leased vehicles to non-Mercedes

5  franchise dealerships, "there is a reduced number of used Mercedes vehicles

6  available on the market for purchase by non-Mercedes franchise dealers for resale."

7  [Dkt. # 20 at ¶ 74]. With respect to increased prices, Plaintiff alleged that by

8  "cornering the market for previously leased MBFS Mercedes vehicles, [current] and

9  future competition between Defendants, Plaintiff, and those similarly situated will be

10  eliminated…and prices for Mercedes' used vehicles will rise to levels they would

11  never have risen in the absence of Defendants' monopolistic and anticompetitive

12  conduct." [*Id*. at ¶ 54]. Plaintiff further alleged Defendants' conduct created "barriers

13  to commerce or entrance into the market" which would never have existed "in the

14  absence of Defendants'…anticompetitive conduct[.]" [*Id*. at ¶ 70, 73].

15      By virtue of alleging the effects of Defendants' anticompetitive behavior,

16  Plaintiff has properly alleged evidence of "direct market power"

17      ***(3)  Because There Was Never an Assignment of Rights, MBFS's Argument***

18            ***Related to Prohibitions on Assignment is Irrelevant***

19      According to MBFS, "lessees always have the option to purchase the leased

20  vehicles at any time; however, they cannot assign the purchase option without

21  MBFS's consent." [Dkt. # 21-1 at 24]. Without belaboring the point, Plaintiff never

22  alleged that consumers "assigned" the purchase option, and rightfully so, as it was

23  not an assignment, but a power of attorney, which allows dealers to purchase leased

24  vehicles as trade-ins. [See, DMV Form REG 262, § 5].

25      "An assignment purports to transfer ownership…to the assignee, giving it

26  standing to assert those rights…on its own behalf…A power of attorney, on the other

27  hand, does not transfer an ownership interest…but simply confers on the agent the

28  authority to act on behalf of the principal[.]" [*Am. Orthopedic & Sports Med. v.*

OPPOSITION TO MERCEDES-BENZ FINANCIAL SERVICES' MOTION TO DISMISS

*Indep. Blue Cross Blue Shield*, 890 F.3d 445, 454-55 (3d Cir. 2018) (citations omitted)]. So long as a consumer retains ownership in the vehicle, they may, as the principal, "confer on [their] agent the authority" to invoke the purchase option on the consumer's behalf, "and the anti-assignment clause no more has power to strip [Plaintiff] to act as [the lessee's] agent than it does to strip [the lessee] of [their] own ability to [purchase the vehicle]." [*Ibid.*]

Because the process by which Plaintiff purchases leased Mercedes vehicles is not through an "assignment," MBFS's argument related to its prohibitions on assignment should be given no regard.

**(D) PLAINTIFF PROPERLY ALLEGED A CLAIM UNDER THE UNFAIR AND UNLAWFUL PRONGS OF THE UCL**

California's Unfair Competition Law ("UCL") prohibits "unfair competition," which it defines as "any unlawful, unfair or fraudulent business act or practice." [Bus. & Prof. Code § 17200]. Because the UCL is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. [*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999)].

**(1) *The "Unlawful" Prong is Satisfied by the Allegations of MBFS's Anticompetitive Conduct***

A business act or practice is "unlawful" when the act or practice is forbidden by law. [See, *Farmers Ins. Exch. v. Superior Court*, 2 Cal.4th 377, 383 (1992)]. Any business act or practice that is unlawful, in the sense that it violates a specific statute, may be enjoined under the UCL. [See, *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 209–210 (1983); see also, *Consumers Union of United States, Inc. v. Fisher Dev., Inc.,* 208 Cal.App.3d 1433, 1438–1439 (1989)]. In other words, virtually any law—civil, criminal, federal, state, municipal, statutory, regulatory, or court-made—can serve as the predicate for an unfair competition action. [*See, e.g., Californians for Population Stabilization v. Hewlett-Packard Co.,*

-28-

58 Cal.App.4th 273, 287 (1997) (explaining that courts have used anti-discrimination laws, antitrust laws, criminal laws, environmental protection laws, fish and game laws, housing laws, labor laws, and vehicle laws to find that a particular business practice was "unlawful" under the UCL).].

In short, activities which constitute a combination in restraint of trade are not only unlawful under the Cartwright Act, but also under common law. [*See, e.g., Speegle*, 29 Cal.2d at 44 ("under the common law of this state[,] combinations entered into for the purpose of restraining competition and fixing prices are unlawful.")]. Given the well-settled judicial principle which encourages the use of court-made or "common laws" as the basis for finding a business practice to be "unlawful" under the UCL, Plaintiff need not even survive dismissal of the Cartwright claim—for the mere failure to plead a claim under Cartwright does not translate into a failure to plead a claim under the UCL based on the same set of facts. More fundamentally, and as explained in §§ IV(B) and (C), *supra*, Plaintiff did, in fact, properly state a claim for relief under Cartwright.

### (2)  *Under Any Form of Recognized Legal Analysis, MBFS's Alleged Conduct Was Categorically "Unfair"*

The California Supreme Court has held that because § 17200 is written in the disjunctive, an act or practice may be independently actionable as "unfair," even if the act or practice is "not specifically proscribed by some other law." [*Cel-Tech,* 20 Cal.4th at 180]. The standard for determining whether conduct is unfair is "intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud." [*State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal.App.4th 1093, 1103 (1996) (citing *Motors, Inc. v. Times Mirror Co.*, 102 Cal.App.3d 735, 740 (1980)).]. Indeed, the very purpose of the UCL was to "enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.'" [*Barquis v. Merchs. Collection Ass'n of Oakland, Inc.*, 7 Cal.3d 94, 112 (1972) (citations omitted)].

Generally speaking, an unfair business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [*Candelore v. Tinder, Inc.*, 19 Cal.App.5th 1138, 1155 (2018) (citations omitted)]. The California Supreme Court has not established a definitive test to determine whether a business practice is unfair. (*See, e.g., Nationwide Biweekly Admin., Inc. v. Superior Court*, 9 Cal.5th 279, 304 (2020)  [acknowledging that "a split of authority has developed in the Courts of Appeal with regard to the proper test for determining whether a business practice is unfair under the UCL in consumer cases"].) In the absence of any definitive test, three separate tests have evolved. Under any of these tests, MBFS's alleged conduct, when presumed true, is categorically "unfair."

### (a)   MBFS's Alleged Conduct is Unfair Under the "Balancing Test"

One line of appellate decisions has held that claims under the UCL's "unfair" prong must be subjected to a "balancing test." Under this test, the court determines whether a business practice is unfair based on "an examination of [the practice's] impact on its alleged victim, balanced against the reasons, justifications[,] and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." [*Smith v. State Farm Mutual Automobile Ins. Co*., 93 Cal.App.4th 700, 718 (2001)].

Defendants' business practice of denying consumers the ability to trade-in their leased vehicles with anyone other than Defendants and their franchise dealers not only negatively impacts consumers at large, but even more significantly impacts non-Mercedes dealers such as Plaintiff. It is a consumer's legal right under California law to provide power-of-attorney to a vehicle dealership in order to pay off the vehicle. As discussed above, the California DMV has even created a form for such situations. [See, DMV Form REG-262]. The negative impact of Defendants' actions not only affects consumers and non-Mercedes dealerships, such as Plaintiff, but actually extends to causing what will invariably be a significant reduction of used

1    Mercedes vehicles for sale by anyone other than Mercedes franchise dealerships.

2    This conduct is purely motivated by greed because the end result is that the

3    consumer and non-Mercedes dealers are cut out of the loop while Defendants and

4    their franchisees are able to capture as much profit as possible. [Dkt. #20 at ¶¶ 52-

5    53]. Furthermore, MBFS has not and cannot provide sufficient justification for its

6    conduct. For years, Defendants have never raised an issue with third party payoffs,

7    but as soon as the market for durable goods becomes constrained, Defendants' first

8    responsive action is to engage in anticompetitive conduct.

9    On a balance, the utility of MBFS's anticompetitive conduct does not

10   outweigh the gravity of harm to consumers; to Plaintiff and those similarly situated;

11   or to the State of California. Consequently, MBFS's conduct is "unfair."

12   **(b)   MBFS's Alleged Conduct is Considered Unfair Under the "Tethering**

13   **Test"**

14   A second line of decisions has adopted what has been termed the "tethering

15   test," requiring that the public policy which is a predicate to the unfair competition

16   action must be 'tethered' to specific constitutional, statutory or regulatory provisions.

17   [See, *Cel-Tech*, 20 Cal.4th at 186-187].

18   As previously stated, a business practice is unfair when it "offends an

19   established public policy or when the practice is immoral, unethical, oppressive,

20   unscrupulous or substantially injurious to consumers." (*Candelore*, 19 Cal.App.5th at

21   1155). In this case, by refusing to give effect to a power-of-attorney which allows

22   non-Mercedes dealerships to step into the shoes of the lessee and payoff the

23   remainder of the vehicle, Defendants were engaged in "unfair" conduct. More

24   specifically, when a consumer is statutorily entitled to purchase a vehicle, it is

25   "unscrupulous" and "substantially injurious to consumers" to interfere with their

26   legal right to trade-in their vehicle merely because the entity with whom the lessee

27   chooses to do business is not a Mercedes dealership. Not only is this practice unfair,

28   but it is also "tethered" to Bus. & Prof. Code § 16720 in that Defendants are

prohibited from engaging in conduct which (1) restrains trade; (2) prevents competition in the sale or purchase of merchandise; or (3) demonstrates an agreement to unite interests such that the result is that the merchandise's price has been affected. [Bus. & Prof. Code § 16720(a), (c), (e)]

As discussed above, Defendants engaged in conduct which was violative of all of the foregoing provisions of § 16720. For this reason, Defendants' "unfair" conduct is tethered to a specific statutory provision.

**(c)   MBFS's Conduct is Considered Unfair Under the "Section 5" Test**

A third line of cases has adopted the three-part definition of unfairness, namely that: "(1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." (*Camacho v. Automobile Club of Southern California*, 142 Cal.App.4th 1394, 1403 (2006); see also, *Rubenstein v. The Gap, Inc.*, 14 Cal.App.5th 870, 880 (2017)]. This test has sometimes been termed the "Section 5 Test."

***First***, Plaintiff and thousands of other California non-Mercedes dealerships who previously earned significant business through the process of "third party payoffs," have unnecessarily been blocked from engaging in the sale or purchase of previously leased Mercedes vehicles. In the aggregate, there can be no question that the injury to Plaintiff and the putative class is substantial.

***Second***, there are no countervailing benefits when, in the near future, the only place consumers will be able to find a previously leased Mercedes vehicle is from a Mercedes dealerships; nowhere else.

***Third***, the injury could not have been avoided because, it was Defendants, not Plaintiff, who chose to engage in this activity, and in the absence of this anticompetitive activity, Plaintiff would never have suffered injury.

**(E)   PLAINTIFF'S CLASS DEFINITION IS NOT "FAIL-SAFE"**

A "failsafe" class is a proposed class which "precludes membership unless the

-32-

1   liability of the defendant is established." [*Kamar v. RadioShack Corp.*, 375 Fed.
2   Appx. 734, 736 (9th Cir. 2010)]. According to MBFS, Plaintiff's proposed class
3   definition is "failsafe" because "membership is dependent on adjudication" of
4   whether class members were deprived "of the supposed 'right' to accept leased
5   vehicles as a trade-in." [Dkt. # 21-1 at 33]. In typical fashion, MBFS is laboring
6   under a misapprehension of what actually constitutes a "failsafe" class.

7       The proposed class in this case does not require a merits determination
8   because a fair reading of the proposed class assumes that all class members are non-
9   Mercedes dealerships who "have or will suffer damages" as a result of Defendants'
10  refusal to allow third party payoffs. [Dkt. # 20 at ¶ 63]. More specifically, Plaintiff's
11  class definition does not include non-Mercedes dealerships who "may" have suffered
12  damages, but instead includes only those non-Mercedes dealerships who "definitely"
13  suffered damage or loss of profits by reason of Defendants' refusal to allow third
14  party payoffs.

15      Next, MBFS argues that "class membership cannot be determined without an
16  individualized minitrial of the circumstances under which the dealer's rights were
17  allegedly violated or caused any damage." [Dkt. # 21-1 at 33]. Not true. With regard
18  to "administrability" of the class, the Ninth Circuit holds that "the language of Rule
19  23 does not impose a freestanding administrative feasibility prerequisite to class
20  certification." [*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017);
21  see also, *Walker v. Life Ins. Co of the SW*, 953 F.3d 624, 633 (9th Cir.
22  2020)]. Moreover, simply because a "class may have to be ascertained through a
23  combination of evidentiary sources does not necessarily mean that ascertaining it is
24  administratively infeasible." [*Bowerman v. Field Asset Servs., Inc.*, 2015 U.S. Dist.
25  LEXIS 37988, at *22 (N.D. Cal. Mar. 24, 2015)]. In fact, Ninth Circuit caselaw
26  "appears to disapprove of the premise that a class can [even] be fail-safe." [*Makaron*
27  *v. Enagic USA, Inc.*, 324 F.R.D. 228, 235 (C.D. Cal. 2018) (citations omitted); see
28  also, *Olney v. Job.Com, Inc.*, 2013 U.S.Dist.LEXIS 141339, at *33 (E.D.Cal. Sep.

-33-

30, 2013) ("[I]n the Ninth Circuit, it is not necessary to deny certification (or in this case strike class allegations) simply because the initially proposed class is a 'fail safe' class.")].

In sum, Plaintiff's proposed class is not "failsafe." But even assuming there was some sort of "failsafe" issue—which there is not—the proper method for addressing a "failsafe" class definition is not to dismiss the case or deny certification, but to simply allow the Plaintiff to "refine[] the class definition." [*Sauter v. CVS Pharm., Inc.*, 2014 U.S.Dist.LEXIS 63122, at *25 (S.D.Ohio 2014); see also, *Powers v. Hamilton Cnty. Pub. Defender Com'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions.")]. In any event, even if Plaintiff's class definition was improper, the issue is not appropriately addressed at the motion to strike stage, but during the motion for class certification. [*See, e.g., Haghayeghi v. Guess?, Inc*., 2015 U.S.Dist.LEXIS 43243, at *14 (S.D.Cal. 2015) (explaining that although class definition "is suspect…the Court finds it more appropriate to address the issue in a motion for class certification.")].

## V.    CONCLUSION

For the foregoing reasons, MBFS's Motion to Dismiss should be denied. To the extent the Court finds any Plaintiff's claims were improperly plead, Plaintiff respectfully requests leave to amend in order to more particularly point out the basis for the relief being sought.


Date: April 5, 2022                    **LAW OFFICE OF ROBERT L. STARR**


                                       /s/ Theodore R. Tang
                                       Theodore R. Tang
                                       Attorney for Plaintiff
                                       Calabasas Luxury Motorcars